CHICAGO, R. I. & P. RY. Co. *v.* UNION PAC. RY. Co. *et al.*

CHICAGO, M. & ST. P. RY. Co. *v.* SAME.

(*Circuit Court, D. Nebraska.* July 27, 1891.)

1. RAILROAD COMPANIES—LEASE—EXECUTION OF CONTRACT.
   A contract giving one railroad trackage rights over part of the line of another company was signed and attested by the proper officers of the latter company. It was approved by the executive committee, which, under authority of the board of directors, exercised the powers of the board when it was not in session. Authority to make such a delegation of power had been given to the board by the by-laws, and power to make such by-laws was given to the stockholders by the act of incorporation. At a regular meeting of the stockholders the contract was approved by all the stockholders present, being two-thirds of the entire number. *Held*, that the contract was sufficiently executed to bind the corporation, though it had never been formally ratified by the board of directors, and though the notice of the stockholders' meeting made no mention of the contract.

**2. SAME—CORPORATE POWERS.**

A contract whereby a railroad company lets another company into joint possession of part of its line for 999 years, at an agreed rental, is not, as between the parties, *ultra vires*, where such joint possession does not interfere with the present use of such line by the company that owns it.

**3. SAME—SPECIFIC PERFORMANCE.**

Specific performance of such a contract may be enforced by a court of equity. Following *Joy* v. *St. Louis*, 138 U. S. 1, 11 Sup. Ct. Rep. 243.

**4. SAME.**

Where such contract was fairly entered into, and provides for a rental which is nine-tenths of that which the lessor company had previously determined to ask, and the lessee, in reliance on the contract, has abandoned its plans for the construction of an independent line, and has spent more than $1,000,000 in building a road to connect with the leased line, a decree for specific performance should not be refused on the ground that the rental is inadequate, and that the effect of the contract may be to permit disastrous competition between the two roads.

**5. SAME—CONSIDERATION.**

Where one railroad company owns substantially all the stock of another railroad company, a lease of the latter's line for rent to be paid to the former company is not void for want of consideration, since it amounts merely to an agreement to pay the rent directly to the stockholders.

In Equity.

*T. H. Withrow, J. M. Woolworth, A. J. Poppleton,* and *J. W. Cary,* for plaintiffs.

*John F. Dillon, A. L. Williams,* and *John M. Thurston,* for defendants.

BREWER, Justice.   On the 1st day of May, 1890, that which on its face purports to be a contract between five railroad companies,—to-wit, the Union Pacific Railway Company, Omaha & Republican Valley Railway Company, Salina & Southwestern Railway Company, Chicago, Rock Island & Pacific Railway Company, and Chicago, Kansas & Nebraska Railway Company,—was signed and acknowledged by the respective presidents of those companies, attested by their secretaries, and received the impress of their corporate seals.   While five companies joined thus in the execution of this instrument, there were really but two parties to the contract,—the Chicago, Rock Island & Pacific Railway Company and the Chicago, Kansas & Nebraska Railway Company, representing one interest and forming one party; the three other companies representing the other interest, and constituting the other party.   For convenience, the first named will be hereafter called the Rock Island party, and the latter, the Pacific.   The exact nature of the relations between the members of these two parties, as respects themselves, need not be stated.   It is enough to say that there was on each side a unity of interest and a unity of control.   Each party controlled an extensive railway system.   The Rock Island embraced three main lines, each running from Chicago,—one to Council Bluffs, one to Kansas City, and the third to Denver; the Pacific,—one from Council Bluffs to Ogden, one from Council Bluffs to Denver, and another from Kansas City to Denver.   The Denver line of the Rock Island passed through St. Joseph and Beatrice.   By filling a gap between Council Bluffs and Beatrice, the Rock Island would secure a shorter and better Denver line.   The purpose and scope of the contract was the filling of this gap; and it provided therefor by the Pacific giving to the Rock Island the use of its

track from Council Bluffs to South Omaha, this track crossing the Missouri river on the Pacific's bridge; the building by the Rock Island of a road from South Omaha to Lincoln; and the giving by the Pacific of the use of its track from Lincoln to Beatrice.    The Rock Island proceeded to construct a road from South Omaha to Lincoln, and about the 1st of January of this year sought to use the Pacific's tracks between Council Bluffs and South Omaha, and Lincoln and Beatrice, which use was denied by the Pacific.    Thereupon this bill was filed in the district court of Douglas county, Neb., to compel specific performance of the contract.    A preliminary injunction was granted by the district court, though no possession was ever in fact taken or use made of these lines by the Rock Island.    Immediately thereafter the Pacific removed the case to this court. In due course of time, the pleadings were completed, the proofs taken, and the case is now before us for final determination.

Four questions have been presented, and argued with distinguished ability.    They are—*First*, was the instrument, as thus signed and attested, so authorized and executed as to become and be a contract of the corporations?    *Second*, if it was so authorized and executed, was it *ultra vires?*    *Third*, if not *ultra vires*, is it a contract of which a court of equity may compel specific performance?    And, *fourth*, if it may, ought specific performance to be decreed?

With regard to the first question, that the contract was signed by the proper executive officers, and that the formalities of execution were sufficient, is not disputed; and, if it was one of those minor contracts which fall within the scope of the ordinary powers of chief executive officers, no question could arise as to its being a contract of the corporations. But it is not such a contract.    It is one of vast moment, running for 999 years, and affecting largely the financial interests, business, and policy of the corporations.    It so changes the sweep of the future that no mere executive officer, of his own volition and by virtue of the ordinary powers of his office, could commit the corporation thereto.    But authority beyond that of the executive officers is not wanting.    After the contract had been drafted, and on the 22d day of April, 1890, it was submitted to the executive committee of the Union Pacific Railway Company,—and of that company's relation to the contract I first speak,—and unanimously approved by all the members of that committee then present.    The committee consists of seven, and six of the seven were present.    Thereafter, and on the 30th day of the same month, the regular annual meeting of the stockholders was held, at which over two-thirds of the capital stock of the company was represented, to-wit, 437,376 shares; and at such meeting this resolution was unanimously adopted:

"Resolved, that the agreement between the Union Pacific Railway Company, the Omaha & Republican Valley Railway Company, the Salina & Southwestern Railway Company, the Chicago, Rock Island & Pacific Railway Company, and the Chicago, Kansas & Nebraska Railway Company, dated May 1, 1890, (a copy of which is herewith submitted,) granting to the two last-named companies trackage rights over this company's lines from Council Bluffs to Omaha, including the Omaha bridge, and the lines of this company's Omaha & Republican Valley branch, from Lincoln to Beatrice, Neb., and pro-

viding, further, for the use by this company of the Chicago, Kansas & Nebraska Railway Company's lines between McPherson and South Hutchinson, Kan., and the line from South Omaha to Lincoln, Neb., on the terms therein provided for, be, and is hereby, approved, and the action of the executive committee in authorizing the execution thereof is hereby ratified, approved, and confirmed."

—And at the same meeting this resolution was adopted:

"Voted unanimously that the stockholders hereby approve and confirm and ratify all the actions of their board of directors and the executive committee during the past year."

While the contract was never formally presented to the board of directors, and by such board authorized or approved, yet, immediately after the annual election of directors, in 1889, the board met, and, after appointing the executive committee, it "voted that, while the board of directors is not in session, the full power thereof, under the charter and by-laws of the company, be, and hereby is, conferred upon the executive committee;" and this resolution was but a repetition of those passed by the boards of directors in the 10 preceding years. This delegation of power was by virtue of article 4 of the by-laws of the company, which reads:

"The board of directors shall have the whole charge and management of the property and effects of the company, and they may delegate power to the executive committee to do any and all acts which the board is authorized to do, except such acts as by law, or these by-laws, must be done by the board itself."

In the original charter of the Union Pacific Railway Company, (12 St. 489, § 1,) the power to make by-laws was granted by this sentence:

"Said company, at any regular meeting of the stockholders called for that purpose, shall have power to make by-laws, rules, and regulations as they shall deem needful and proper, touching the disposition of the stock, property, estate, and effects of the company, not inconsistent herewith, the transfer of shares, the term of office, duties, and conduct of their officers and servants, and all matters whatsoever which may appertain to the concern of said company."

It is clear from these quotations from the records of the company that, so far as the executive committee and the stockholders could by their approval bind the corporation to this contract, they did so. As against this, it is contended that, as the board of directors did not formally act upon, either to authorize or approve the contract, the corporation never became bound, because power in respect to such matters is lodged solely in the board of directors; and, *secondly*, that if this be not true, and the stockholders are vested with power in respect thereto, the vote of the stockholders at the annual meeting was not sufficient, because in the call for such meeting no mention was made of this proposed contract; and the minority of the stockholders, who were not present, were thus given no opportunity to consider it, and never joined in the approval. Neither

of these propositions can be sustained.   By the original Union Pacific act, there was created "a body corporate and politic, in deed and in law;" which corporation was "authorized and empowered to lay out, locate, construct, furnish, maintain, and enjoy a continuous railroad and telegraph," etc.; and was also "vested with all the powers, privileges, and immunities necessary to carry into effect the purposes of this act, as herein set forth."   By this act, therefore, was created a corporation, with all the powers incident to corporate existence.   One of those incidents is that the ownership of the corporate property is vested in the stockholders, and with them rests also the absolute and ultimate power. In the *Dartmouth Colleye Case*, 4 Wheat. 518, Judge STORY, speaking of an aggregate corporation, says, (page 667:)   "Among other things, it possesses the capacity of perpetual succession, and of acting by the collected vote or will of its component members."   It is true that the act provides that there shall be certain directors appointed by the government.   This provision was inserted doubtless because of the fact that the government, as second mortgagee and a bountiful donor to the company, was largely interested.   It is also true that subsequent legislation (13 St. 361, § 13) provides that at least one government director shall be a member of each standing committee.   But there is nothing in the original act, or any subsequent legislation, giving to them either veto or controlling power; and from some of the reports which have been made in times past, by these government directors to the government, as well as from some of the developments in this case, it would seem as though they were too often regarded as merely convenient and useful ornaments. While doubtless congress could have vested either in the board of directors as such, or in these government directors, absolute and exclusive control in matters like this, yet it did not.   Not only did it, as appears from the provisions heretofore quoted, give to the stockholders control over "all matters whatsoever which may appertain to the concern of said company," but also its express grant of powers to the directors is by the same section limited to the election and appointment of officers and agents, the location and construction of the road, and the matter of subscriptions.   All other powers which the directors have are those which spring from the nature of their officers, or from special grants from the stockholders.   In this, as in any other stock corporation, with the stockholders rests not only the ownership of the property, but the ultimate and absolute power and control.   Much is said in the books about the ordinary and extraordinary powers of a corporation,—the one vested in the directors, the other in the stockholders or members.   In 1 Beach, Priv. Corp. § 73, the rule as to the latter is thus stated:

"To the members is reserved also the right of applying to the legislature for amendments of their charter, and the power to accept or reject proposed amendments thereof, to alter the articles of association, to authorize an increase or reduction of the capital stock, to sell or lease the corporate property, or modify the terms of an existing lease, to consolidate or merge the company with other corporations; and, in general, all extraordinary or unusual powers not conferred upon the directors, expressly or by necessary implication, are reserved to the members."

If this statement of law be correct, then this contract is one beyond the power of directors to make, and could be authorized only by the stockholders; for the making of such a contract is not among the matters expressly or by necessary implication granted by the charter to the directors. But I rest little on this distinction; for any act, although within the powers of a board of directors, when done by an executive officer, with the direction or approval of the stockholders, is binding on the corporation, although the directors have never directed or approved of it, unless by the terms of the charter exclusive power therefor is vested in the directors. Neither is there force in the other objection,—that the notice of this annual meeting did not specify these contracts. The charter, in the same section heretofore quoted from, provides for annual meetings of the stockholders, for the transaction of business, "to be holden at such time and place, and upon such notice, as may be prescribed in the by-laws." Notice of time and place was given as prescribed by the by-laws, and the meeting was duly held. There is no by-law requiring special mention of the subjects to be considered at such meeting. Every stockholder, therefore, takes notice of the fact that all business which may be transacted by the stockholders is open for consideration and action at such meeting; and their powers at such a meeting are as vast and complete as the competencies of the corporation. Indeed, at the time the notice was given of this annual meeting, this contract was not prepared, and could not have been specified therein; and the fact that other matters were specified in the notice in no manner limited the powers of the stockholders at such meeting. *State* v. *Bonnell*, 35 Ohio St. 10; *Warner* v. *Mower*, 11 Vt. 385; 1 Beach, Priv. Corp. § 279; *Sampson* v. *Steam-Mill Corp.*, 36 Me. 78; 1 Mor. Priv. Corp. § 482; Cook, Stocks, § 595.

Summing up this question: The instrument was signed and attested by the proper officers. It was approved by the executive committee, which executive committee was granted *ad interim* by the board of directors all the powers of that board. Authority to make such a delegation of power was given to the board by the by-laws. Power to make such by-laws was bestowed by the act of incorporation upon the stockholders. At the regular meeting the contract was approved by all the stockholders present, being two-thirds of the entire number. Under these circumstances, if the contract was one which the corporation could make, it was fully authorized and duly executed, and binding.

So I pass to the second question: Is the contract one which the corporation could make, or is it *ultra vires?* The doctrine of *ultra vires* has been thoroughly sifted within the last 30 years,—its extent and limitations clearly defined. *Thomas* v. *Railroad Co.*, 101 U. S. 71; *Branch* v. *Jesup*, 106 U. S. 468, 1 Sup. Ct. Rep. 495; *Pennsylvania R. Co.* v. *St. Louis, A. & T. H. R. Co.*, 118 U. S. 290, 6 Sup. Ct. Rep. 1094; *Oregon Ry. & Nav. Co.* v. *Oregonian Ry. Co.*, 130 U. S. 1, 9 Sup. Ct. Rep. 409; *Central Transp. Co.* v. *Pullman's Palace Car Co.*, 139 U. S. 24, 11 Sup. Ct. Rep. 478. Two propositions are settled. One is that a contract by which a corporation disables itself from performing the func-

tions and duties undertaken and imposed by its charter is, unless the state which created it consents, *ultra vires*. A charter not only grants rights,—it also imposes duties. An acceptance of those rights is an assumption of those duties. As it is a contract which binds the state not to interfere with those rights, so, likewise, it is one which binds the corporation not to abandon the discharge of those duties. It is not like a deed or patent, which vests in the grantee or patentee, not only title, but full power of alienation; but it is more,—it is a contract whose obligations neither party, state or corporation, can, without the consent of the other, abandon. The other is that the powers of a corporation are such, and such only, as its charter confers; and an act beyond the measure of those powers, as either expressly stated or fairly implied, is *ultra vires*. A corporation has no natural or inherent rights or capacities. Created by the state, it has such powers as the state has seen fit to give it,—"only this, and nothing more." And so, when it assumes to do that which it has not been empowered by the state to do, its assumption of power is vain; the act is a nullity; the contract is *ultra vires*. These two propositions embrace the whole doctrine of *ultra vires*. They are its alpha and omega. To determine the applicability of these propositions to the contract, we must notice its features a little more in detail. It is too long to quote in full, but the first section of the first article is its kernel. It is as follows:

"The Pacific Company hereby lets the Rock Island Company into the full, equal, and joint possession and use of its main and passing tracks, now located and established, or which may be hereafter located and established, between the terminus of such tracks in the city of Council Bluffs, in the state of Iowa, and a line drawn at a right angle across said tracks within one and one-half ($1\frac{1}{2}$) miles southerly from the present passenger station of South Omaha, in the state of Nebraska, including the bridge on which said tracks extend across the Missouri river, between said cities of Council Bluffs and Omaha; connections with Union Depot tracks in Omaha, the side or spur track leading from the main tracks to the lower grade of the Pacific Company's sidings and spur tracks in Omaha, and such extensions thereof as may be hereafter made; side tracks in Omaha on which to receive from and deliver to the Rock Island Company freight that may be handled through the warehouses, or switched by the Pacific Company; the connections with the Union Stock-Yards tracks in South Omaha, and conveniently located grounds in South Omaha, on which the Rock Island Company may construct, maintain, and exclusively use a track or tracks, aggregating three thousand (3,000) feet in length, for the storage of cars and other purposes,—for the term of nine hundred and ninety-nine (999) years, commencing on the first day of May in the current year; for which possession and use the Rock Island Company covenants, promises, and agrees to pay to the order of the said Pacific Company, monthly, during the continuance of said term, the sum of three thousand seven hundred and fifty (3,750) dollars, with the proportion of the costs and expenses actually incurred during the month for which such payment is made, in maintaining, repairing, and supplying with water that portion of such main tracks jointly used and situated east of the east end of said bridge, and in the city of Council Bluffs, and in paying taxes and assessments legally laid and levied thereon, which proportion shall be to the aggregate of the amount so paid as the proportion of the number of wheels per mile operated during the same month by the Rock Island Company over said tracks, or any part

thereof, shall be to the whole number of wheels operated per mile over the same tracks during the same period; which sum the Pacific Company agrees to receive as full compensation for such possession and use."

It is said by the defendant that this is a lease; the language of demise is used; and a lease was denounced in 101 U. S., 118 U. S., and 6 Sup. Ct. Rep., 130 U. S., and 9 Sup. Ct. Rep., 139 U. S., and 11 Sup. Ct. Rep., *supra*, as *ultra vires;* to which it is replied that in the resolution quoted above, passed by the stockholders, approving this agreement, it was called "one granting trackage rights." But neither the form of expression on the one hand, nor the name on the other, is conclusive. We must see what rights and privileges were in fact granted, what burdens and obligations assumed, in order to determine whether that which was attempted to be done was beyond the competency of the corporation. The contention of the defendant is substantially threefold: *First*, that the contract, if put in force, will at once disable the Pacific from performing the duties imposed upon it by its charter; *second*, that if it will not at once have that effect, it will before the termination of the 999 years of its term; and, *third*, that the charter, neither in terms nor by implication, gives power to make such a contract.

The question as to whether a contract is *ultra vires* or not may arise in a controversy between the state and a corporation, or between the corporation and the party with whom it has assumed to contract; and it may well be that different rules of construction apply to the two cases: All grants, even grants of corporate franchises, are construed strongly in favor of the government, and against the grantee. So when the state challenges the action of one of its corporate creations, it may insist on clear warrant for such action. It may say: "Point to the letter of your authority. I abide by my contract, and protect you in the rights and franchises I have given. Abide by your contract, and assume to do no act in disregard of the duties I have imposed, or beyond the authority I have conferred." The rule of strict construction exists in such a case. But a milder rule applies when a corporation seeks to repudiate a contract into which it has formally entered. It is not seemly for a corporation, any more than for an individual, to make a contract and then break it; to abide by it so long as it is advantageous, and repudiate it when it becomes onerous. The courts may well say to such corporation: "As you have called it a contract, we will do the same. As you have enjoyed the benefits when it was beneficial, you must bear the burden when it becomes onerous, unless it clearly appears that that which you have assumed to do is beyond your powers." In *Railway Co.* v. *McCarthy*, 96 U. S. 267, the supreme court said:

"When a contract is not on its face necessarily beyond the scope of the power of the corporation by which it was made, it will, in the absence of proof to the contrary, be presumed to be valid. Corporations are presumed to contract within their powers. The doctrine of *ultra vires*, when invoked for or against a corporation, should not be allowed to prevail where it would defeat the ends of justice or work a legal wrong."

In other words, courts should be clearly satisfied that a contract is *ultra vires* before, at the instance of a corporation, they release it from the obligations which it has voluntarily assumed. With this rule of construction in mind, I pass to the consideration of the three contentions of the defendants. It clearly will not operate at present to disable the Pacific from discharging its duties. While the Rock Island is let into possession and use, the Pacific is not put out of possession and use. There is no surrender of the exclusive use of any portion of the Pacific's line. It remains in the undisturbed possession of every mile of its track; can operate all its trains, and discharge all the duties which it owes to the government or the public. A different question would arise if it had attempted by this instrument to dispose of the full possession of the same length of its track. Its obligation to the government is not to hold all its tracks or property beyond the use or touch of any other corporation. It goes no further than to retain such possession and use as will enable it to run all its trains, and carry all its passengers and freight. No monopoly of isolation from other currents of business is essential to this. It may do all the business which is offered, and still have a surplus use of its tracks. Can it be that its obligation to the government or the public compels it to let that surplus use lie idle? It is rather for, than against, the interest of the government which creates it; and which is itself interested, as second mortgagee and the holder of a large claim against it, that it coin all such surplus use into money. Surely, if this be so, it does not come within the scope of the first proposition. I shall not attempt to refer to the testimony in detail. Indeed, I think it is conceded that, if this contract was put to-day in full operation, the Pacific would have ample accommodations for all its business. In this respect the case is very different from those cited from the supreme court. In them there was a full surrender of possession. As said by Mr. Justice MILLER in the *Thomas Case:*

"The provision for the complete possession, control, and use of the property of the company and its franchises by the lessees is perfect. Nothing is left in the lessor but the right to receive rent. No power of control in the management of the road and in the exercise of the franchises of the company is reserved."

I conclude, therefore, that this contract is not objectionable, as now disabling the Pacific from discharging the duties imposed by its charter. But the term of this contract is 999 years; and it is strongly insisted that long before that time has been reached the growing business of the Pacific will demand the entire possession and use of all its tracks and facilities, and that the length of the term makes that void which might have been valid if for a few years. To this, in my judgment, there are two satisfactory replies. No man can foresee the future. While we have a right to believe that the country will grow in population and business, and have a right to expect that the business of this particular corporation will increase, yet we also know that, with increased volume of business, as a rule come increased facilities and means for transacting that business. It is not to be expected that the business of any railroad will

increase in the next 20 years in the same ratio as the last. New roads are constantly being built, other channels of transportation will arise, and business so increasing will be divided among more. Who, indeed, can say that the railroad itself will be the common means of transportation 20 years hence? May not electric lines, on differently constructed tracks, supersede the railroads, as the railroad has superseded the canal? Into that field of speculation who may safely enter, and what decrees may be founded thereon?

But again, the powers of a court of equity do not end with a day. If the changed condition of affairs 20 years hence shall make the full use of its tracks and other facilities necessary to the Pacific, for the transaction of its business and the discharge of its duties to the government and the public, the powers of a court of equity are equal to the emergency, and can relieve it from the obligations of this contract; for the obligation of a corporation to not disable itself from the discharge of its duties is a continuing one, and all contracts which it makes endure only so long as their continuance does not create such a disability. This matter has embarrassed me a good deal, but I have come to the conclusion that sufficient to the day is the evil thereof, and strong enough and adequate for to-morrow are the powers of a court of equity. It is at least clear that the government is not concluded by any decree between these parties; and whenever its rights are disturbed it may interfere and compel, as against everybody, the full discharge of its duties by the Pacific. Neither can it be said that this contract is clearly beyond the powers granted to the Pacific. It is obvious to all that the exigencies of public interests have enlarged the area of the incidental and implied powers of a corporation. Witness the many things which railroad companies to-day freely and without question engage in, in furtherance of their transportation business, which are strictly not part of such business. Their depots are often eating-houses and hotels; dining and sleeping cars are on many trains; bath-rooms and libraries on some; hospitals are furnished; insurance to employes is not uncommon; yet who can say that these things are a part of the laying out, construction, or operation of a railroad, strictly speaking; yet it would startle the common sense of the business world if the contracts of the railroad companies for the carrying out of these incidental matters were by the courts declared *ultra vires*. In the case at bar, as we have seen, the contract is not one for the dispossession of the Pacific Company from the use of its tracks or other facilities. It is not one disabling it from discharging its duties. It is simply one to coin into money, for its benefit, the surplus use of a part of its property. Can it be that such a contract is beyond the powers implied by the grant? Concede that, under the power to lay out, construct, and operate a railroad, it is not authorized to build tracks for the purposes of sale or lease, but when discharging its duties it builds tracks for its own use, and uses them, if all the use it can make is limited, and there be a large amount of surplus use, upon what reason can it be adjudged that that surplus use must necessarily lie idle? It is a thing of value. It may be, as it is done by this contract, coined into money. What right or interest of

the government or public is prejudiced thereby? If a railroad company builds a depot which is larger than its present needs require, may it not rent one room, and receive profit therefrom? or must it, because it is not authorized to build buildings for rent, let that room remain vacant until the increase of its business requires its use? The Pacific Company may not build tracks for the purpose of leasing them, but it must have at least one track for the passage of its own trains. If its trains do not fully use that track, as in this case they do not, it has a surplus of use, which is of value, and which it may make profit out of in any manner not inconsistent with its duties to the public and its obligations to the government. I think it may be laid down as a general proposition that a corporation which, in its discharge of the duties imposed by its charter, acquires property which it must have for its own uses, may, if there be a surplus use of such property, make a contract for the disposition of such surplus use in any manner not inconsistent with the purposes of its creation. So I conclude that neither of the three objections is well taken, and hold that the contract is not *ultra vires.*

So far as the Omaha & Republican Valley Railway Company is concerned, it is objected that the contract is invalid, because it is without consideration; the contract providing that the Rock Island shall pay to the Union Pacific Railway Company the rental for the use of the Omaha & Republican Valley Railway Company's line. There is little force in this. The Union Pacific Company owns substantially all the stock of the Omaha & Republican Valley Railway Company, and a contract by a company that the rental for the partial use of its property shall be paid directly to the stockholders, instead of to the company, surely cannot be declared beyond the power of the corporation. This is all that need be said in respect to the relation of the Omaha & Republican Valley Railway Company to this contract.

*Third,* is this contract one of which a court of equity may compel specific performance? Fortunately, a recent decision of the supreme court, in the case of *Joy* v. *St. Louis,* 138 U. S. 1, 11 Sup. Ct. Rep. 243, relieves from any embarrassment. That case was originally heard before me while I was circuit judge; and after a careful examination, and though in the face of seemingly adverse precedents, I decreed specific performance of a contract for the joint use of track. That decree was affirmed by the unanimous opinion of the supreme court. All the objections which are here made were presented there, and overruled, and the necessity of the interposition of a court of equity in cases of this kind clearly shown by Mr. Justice BLATCHFORD, in the opinion of the court. The spirit of that decision is expressed in this quotation:

"Railroads are common carriers, and owe duties to the public. The rights of the public in respect to these great highways of communication should be fostered by the courts; and it is one of the most useful functions of a court of equity that its methods of procedure are capable of being made such as to accommodate themselves to the development of the interests of the public, in the progress of trade and traffic, by new methods of intercourse and transportation."

I know, to one who is only familiar with the narrow limits and the strict lines within and along which courts of law proceed, the act of a court of equity in taking possession of a contract running for 999 years, and decreeing its specific performance through all those years, seems a strange exercise of power; but I believe most thoroughly that the powers of a court of equity are as vast, and its processes and procedure as elastic, as all the changing emergencies of increasingly complex business relations and the protection of rights can demand. And, in passing, I may be permitted to observe that in this respect the distinguished jurist who appears for the defendants in this case taught me my lesson; who, on the bench of the circuit court of this circuit, not only took possession of and managed great railroad companies by receivers, but built hundreds of miles of railroad, and created millions of dollars of obligations against those roads. I then watched those proceedings with something of amazement, but the more I studied the more I admired, till, thus having studied at the feet of Gamaliel, I learned to believe that the powers and processes of a court of equity are equal to any and every emergency. They are potent to protect the humblest individual from the oppression of the mightiest corporation; to protect every corporation from the destroying greed of the public; to stop state or nation from spoliating or destroying private rights; to grasp with strong hand every corporation, and compel it to perform its contracts of every nature, and do justice to every individual.

May I be permitted another suggestion: The railroad world to-day is in unrest. Millions of capital have gone into railroad enterprises, seeking profit therefrom. Legislators vie with legislators in efforts to reduce rates. To maintain such rates as will secure just compensation for the capital invested, railroad companies enter into associations and form traffic contracts. But such contracts seem but ropes of sand, and such associations but gilded figure-heads, and not controlling forces. And back of all is a wide and growing demand that the government take possession of all the railroads, and itself become the great common carrier. Is it not possible that the powers of a court of equity may yet be found adequate to the situation? that such courts may yet lay strong hands upon these railroad corporations, and, by compelling performance of contracts, secure stability, uniformity, and justice to all, and thus quiet the clamor, and avoid any necessity of governmental possession and management?

But this is outside of the question before us. Returning to the case: Counsel contend that it is distinguishable from that of *Joy* v. *St. Louis*, in that there was a great public interest to be protected, which justified, as was mentioned in the opinion, the interposition of a court of equity. I think no such distinction exists. There is in this case a public interest as significant and deserving of protection. The testimony discloses that before this contract was entered into the Rock Island had determined to build a bridge across the Missouri river at Omaha, and fill the gap between Council Bluffs and Beatrice by its own line. In conjunction with the Chicago, Milwaukee & St. Paul Railway Company, it had obtained

from congress a charter for the building of the bridge; and negotiations were pending to secure the capital, some two or three millions of dollars, with which to do the work. At that time the officers of the Pacific sought the officers of the Rock Island and the St. Paul, and prevented the building of the new bridge by means of this contract. If this contract had not been made, or it should not now be enforced, two or three millions, at least, of additional capital would be put into railroad and bridge construction; and such an expenditure of money places an additional burden upon the public. Every unnecessary mile of railroad track or bridge that is built adds to the cost of transportation, and surely the public is interested in seeing that that cost be as light as possible. A very serious economic and political question is whether this free country has not made a mistake in giving too large liberty of railroad construction. Take a single illustration: In the state of Colorado, between Pueblo and Denver, are three independent lines of road, with separate and distinct tracks and rights of way. To say nothing of the waste of lands and the injury to farms, the costs of these three lines of road, I am assured, is much more than double that of a single right of way with two tracks; and such single right of way would be adequate for all the business that the three roads have done, or are likely to do, for many years. The public which uses these roads bears the burden of this extra cost. Would not its interests have been promoted if by contract or law all these railroads could have been compelled to unite in a single line? So, here, if the public can prevent an increase of railroad property by the sum of two or three millions of dollars, it saves to itself the burden which that additional expense would cast upon it. Further, a new line running into Omaha cuts up and destroys unnecessarily a large amount of property. So in this, as in the case of *Joy* v. *St. Louis*, there is a public interest at stake which justifies the intervention of a court of equity. This is a case in which, and a contract of which, a court of equity may decree specific performance.

I pass to a consideration of the last question: Ought this contract to be specifically enforced? Of course, it is familiar law that courts of equity do not always decree specific performance of even unquestionably valid contracts. Insufficiency of consideration, want of fairness, or any special hardship resulting therefrom, is sufficient to prevent a decree of specific performance, and send the party to his action at law for damages. Pom. Spec. Perf. § 185; Fry, Spec. Perf. §§ 181, 193, 203. These defenses are interposed here: It is insisted that the rental for the use of the bridge, and the tracks between Council Bluffs and South Omaha, to-wit, $45,000, is grossly inadequate. Contemporaneous with this, another contract of similar import was executed with the Chicago, Milwaukee & St. Paul Railway Company, by which it also was to pay a like rental; so that the rentals secured by these two contracts, for the use of the same property, amount to $90,000. A volume of testimony was taken to show the value of the Pacific's property for which this rental was to be paid. Four or five engineers of ability, and real-estate men of experience, testified fully in respect to this matter. Their estimates

were very divergent, varying from three to seven millions. I shall not attempt in this opinion to review this testimony, or seek to determine which of these estimates is most reliable. Obviously, the estimate of Mr. Smead, the chief engineer of the Pacific, is too high, in that it includes property not covered by the lease. Probably the real value lies somewhere between the respective figures, and nearer three than seven millions. If the value be seven millions, $90,000 rental is only about 1⅓ per cent.; and, if this were the rental for the full and exclusive possession, it would obviously be too low, but there is only a partial possession and a partial use. This rent is so much in excess of that which the Pacific realizes from its own use of the property. Not only that, by section 7 of article 3 of the contract, the Pacific reserves to itself the right to let other companies into the like possession and use of this property, without sharing with these lessees the rentals thus obtained. On the other hand, if the value of the property is only $3,000,000, the rental is 3 per cent., and that for only this partial use. But, beyond this Omaha property, the contract provides for the use by each party of portions of the other's tracks; and the benefits which flow to the Pacific, from its acquisition of parts of the Rock Island's tracks elsewhere in the system, are worthy of notice in determining the sufficiency of the consideration. There are other benefits, also, of a pecuniary nature, the amount of which may not perhaps be easily estimated, which will inure to the Pacific from the pouring of this volume of business of the Rock Island and St. Paul roads over its tracks, rather than over an independent and separate line.

But I place more reliance upon this further matter: As heretofore stated, the contract was sought by the Pacific. The then executive officers of that company, distinguished and competent railroad gentlemen, of long experience in connection with the property, in their consultations as to the price to be demanded, and before any conference with the officers of the Rock Island and the St. Paul, fixed $50,000 as the sum to be demanded, and $45,000 as that to be accepted. Now, when gentlemen so competent to determine such a matter, so interested in securing the best possible terms for the Pacific, without suggestion from the other side, named $50,000 as the rental to be asked, I think it would be strange for a court to hold that a rental of $45,000 was grossly inadequate. This is not a case in which the defendant has been led into a contract, or its terms fixed by inexperienced or incompetent men; but it sought the contract, named its price, and received nine-tenths of the consideration which it proposed to take.

It is further objected that the Pacific does a large local business between Council Bluffs and South Omaha, from which it makes much profit; and that under this contract the Rock Island may itself put on local trains, and, by reducing the fares, practically cut off this source of revenue from the Pacific; whereas, if it built a separate bridge and a separate line, the amount of the cost would be so great that it would be compelled to keep up rates. My observation has taught me that the cutting of rates generally springs from quarrels between competing roads, and is little, if at all, affected by the cost of the property; and if the

Rock Island and St. Paul were now forced to build a new bridge, and establish an independent line, there would be just as much likelihood of the cutting of rates. Aside from the existence of any quarrel, self-interest will prompt the Rock Island and St. Paul to maintain any rate which is just and reasonable. More than that, the Pacific has no right to expect. But another safeguard is this: Every contract implies good faith in the contracting parties, no matter what may be the mere language of the instrument; and if, after having been let into possession, the Rock Island should in any way abuse the privileges given by this lease, the courts are open to furnish protection, even if, to secure it, it be necessary to cancel the lease.

But there are considerations on the other side which are worthy of mention, and which make specific performance right. While no estoppel runs against an *ultra vires* contract, yet it is fair always to consider the situation of the plaintiff if specific performance be denied. The Rock Island has constructed a line from Lincoln to Omaha, and has expended a million and a half of money in reliance upon this contract. It and the St. Paul abandoned their scheme of building a new bridge, and creating a new and independent line into and through Omaha. If now specific performance is refused, what becomes of that investment? Must it lie idle until a year or so have passed, in which a new bridge and a line into and through Omaha can be completed? and who can tell whether, in the changed financial condition, these companies could secure the money with which to build the bridge and construct the line? Suppose the Rock Island was refused specific performance, and relegated to an action for damages, of what avail would such action be? Long would be the delay in prosecuting it to judgment. What would be the measure of damages? And, if a large sum were recovered, is there any certainty, in view of the heavily mortgaged condition of the Pacific, that the judgment could be collected? I think I need continue this discussion no further. I have given this case long and careful consideration. Summing the whole matter up: The defendant sought this contract. Its executive officers were gentlemen of long experience with the property, and distinguished ability as railroad officials. There was no concealment or deception, no fraud or unfairness, on the part of the officers of the plaintiff. There was no opportunity for any; the officers of the defendant company fully understood the situation. To this contract, not only the executive officers, but also the great body of the stockholders, of the Pacific gave their approval. The rental finally agreed upon was within a small fraction of that which the defendant had determined to ask. Relying on this contract, the plaintiff abandoned plans and negotiations for an independent line, and has expended over a million of dollars in building a road from Omaha to Lincoln. It will be grievously hurt if performance is not now decreed. Performance will not disable the Pacific from discharging all its duties and performing all its functions. If the time shall ever come in which performance shall tend to have that effect, the government, at least,—the party having the right to complain,—can interfere and put an end to the plaintiff's possession

and use. The contract is for the interest of the government as second mortgagee, as coining surplus use of tracks into money. It is for the interest of the public in preventing the destruction of valuable property, and the cutting up of a large city by new tracks and right of way, and in avoiding an unnecessary investment of large sums of money in railroad building, and thus increasing the railroad burden. It is to the higher interest of all, corporations and public alike, that it be understood that there is a binding force in all contract obligations; that no change of interest or change of management can disturb their sanctity or break their force; but that the law which gives to corporations their rights, their capacities for large accumulations, and all their faculties, is potent to hold them to all their obligations, and so make right and justice the measure of all corporate as well as individual action. The decree will go for the plaintiff as prayed for. The same considerations require that a like decree be entered in the case of the Chicago, Milwaukee & St. Paul Railway Company against these defendants.