MASON CITY & F D. R CO. v. UNION PAC. R. CO.

(Circuit Court, D. Nebraska. August 19, 1903.)

No. 55.

1. COURTS—RULES OF DECISION—MATTERS PREVIOUSLY DETERMINED BY SUPREME COURT.

Where the question at issue in a suit was the right of complainant railroad company to the use of a bridge owned by defendant railroad company under a contract between the parties, which right was denied by defendant on the ground that the contract was ultra vires on its part, a decision of the Supreme Court on appeal, holding that the contract was valid (1) because it was one which the defendant had the power to make at common law, and (2) because it was expressly authorized by an act of Congress, such act, by reference, embracing a provision of a prior act, is authority on both propositions, and that the two acts referred to are to be construed together; but a further statement in the opinion that such acts made it the duty of the defendant to permit the complainant to run its trains over the bridge was dictum, only, not being necessary to the determination of any question at issue.

2. RAILROADS—UNION PACIFIC BRIDGE ACROSS MISSOURI RIVER—CONDITIONS IMPOSED BY ACT AUTHORIZING.

By Act Feb. 24, 1871, c. 67 (16 Stat. 430), the Union Pacific Railroad Company was authorized to issue its bonds, secured by mortgage on a bridge and approaches to be constructed over the Missouri river between Council Bluffs and Omaha, for the purpose of obtaining the means for the construction of such bridge and approaches. Said act contained a provision that "for the use and protection of said bridge and property the Union Pacific Railroad Company shall be empowered, governed, and limited" by the act of July 25, 1866, c. 246 (14 Stat. 244). The latter act authorized the construction of a number of bridges over the Mississippi and Missouri rivers; and by section 1, authorizing the building of a bridge across the Mississippi at Quincy, "for the more perfect connection of any railroads that are or shall be constructed to the said

¶ 1. See Courts, vol. 13, Cent. Dig. § 335.

river at or opposite said point," it was provided "that when constructed all trains of all roads terminating at said river or opposite said point shall be allowed to cross said bridge for a reasonable compensation to be made to the owners of said bridge." *Held*, that such provision, which by reference became a part of the act of 1871, imposed on the Union Pacific Railroad Company the duty of permitting other companies whose roads terminated at Council Bluffs or Omaha to use the bridge constructed thereunder for the passage of their trains, for a reasonable compensation, and required that all such companies should be treated alike in that respect.

**8** SAME—EFFECT OF CONDITIONS ON MORTGAGEES—AMENDMENT OF CHARTER.
Prior to said Act Feb. 24, 1871, c. 67 (16 Stat. 430), the railroad company, which was chartered by Congress, had executed mortgages on its property then owned and to be acquired, as authorized by its charter; and it also had authority under its charter to build the bridge, but lacked the means, which it was authorized by such act to procure by an issue of bonds secured by mortgage on the bridge and approaches, to be built with their proceeds, subject, however, to certain conditions, among which were the obligations imposed by section 1 of Act July 25, 1866, c. 246 (14 Stat. 244). *Held*, that under such legislation, which was accepted and acted on, the bridge property was acquired or brought into existence, burdened with such conditions, which operated, in effect, as an amendment of the company's charter, and which were effective as against the company and its mortgagees, either prior or subsequent.

**4.** SAME—RIGHTS OF PURCHASER AT FORECLOSURE SALE.
It having been determined in a suit in which all the mortgages on the property of the railroad company were foreclosed that the bridge mortgage constituted the first lien on the bridge property, acquired with its proceeds, on the ground that such was the intention of Congress and of all the parties in interest when such mortgage was authorized and executed, a purchaser at the foreclosure sale took the property subject to the conditions imposed by the act under which such mortgage was given.

In Equity. Suit to establish and enforce the right of complainant to use the Union Pacific Bridge and tracks across the Missouri river, and the approaches thereto, between Council Bluffs and South Omaha.

Frank P. Kellogg, Woolworth & McHugh, and Cordenio A. Severance, for complainant.

W. R. Kelly, John N. Baldwin, and Edson Rich, for respondent.

MUNGER, District Judge. By an act of Congress of date July 1, 1862 (12 Stat. 489, c. 120), the Union Pacific Railroad Company was incorporated with authority to construct and operate a line of railroad from a point to be fixed by the President of the United States on the western boundary of the state of Iowa to the western boundary of the state of Nevada, which act was amended by Congress July 2, 1864 (13 Stat. 356, c. 216). Under the provisions of these acts said railroad was constructed from the initial point designated by the President of the United States on the western boundary of the state of Iowa. Between the state of Iowa and the then territory of Nebraska to the west flowed the Missouri river, which was for several years crossed by said railroad by means of a ferry. Desiring to construct a bridge across the Missouri river, and not having sufficient means for that purpose, said railroad company applied to Congress for authority to issue its mortgage bonds upon the bridge and its approaches for that purpose, pursuant to which

request Congress passed an act of date February 24, 1871 (16 Stat. 430, c. 67). On January 26, 1880, said Union Pacific Railroad Company consolidated with certain other railroads, and formed one consolidated company, under the name of the Union Pacific Railway Company; such consolidated company succeeding to all the property and rights of said Union Pacific Railroad Company, and assuming all of its burdens and obligations. May 1, 1880, the said Union Pacific Railway Company and the Chicago, Rock Island & Pacific Railway Company entered into a contract by the terms of which the said Chicago, Rock Island & Pacific Railway Company was granted the right for a term of 999 years to use the said bridge and approaches across the Missouri river from Council Bluffs to South Omaha for the movement and operation of its engines, cars, and trains between said points. A similar contract was entered into on the 30th day of April, 1890, between said Union Pacific Railway Company and the Chicago, Milwaukee & St. Paul Railway Company. After the parties had operated and acted under said contracts for a period of time, said Union Pacific Railway Company repudiated the contracts upon the claimed ground that each was ultra vires, being a contract not within the power and authority of the Union Pacific Railway Company, under its charter, to enter into. Suits were thereupon instituted by the Chicago, Rock Island & Pacific Railway Company and the Chicago, Milwaukee & St. Paul Railway Company for the specific performance of said contracts, which actions resulted in a decree being entered by this court as prayed. 47 Fed. 15. An appeal was taken to the Circuit Court of Appeals, and the decree affirmed (51 Fed. 309, 2 C. C. A. 174), and on appeal to the Supreme Court was again affirmed (163 U. S. 564, 16 Sup. Ct. 1173, 41 L. Ed. 265).

Commencing in 1893, various proceedings were had, seeking a foreclosure of various mortgages which had been given pursuant to the provisions of the said several acts of Congress before specified. Such proceedings were had that said mortgages were foreclosed, and all of the property and franchises owned and controlled by said Union Pacific Railway Company were sold under the decree of foreclosure, including the bridge, its approaches, and the tracks in question, to ———————————————————— as trustees. Whereupon the present Union Pacific Railroad Company, respondent in this action, was organized under the laws of the state of Utah, and became and now is the owner of the property and franchises so sold at such foreclosure sale. After its organization and acquiring of the property, the present Union Pacific Railroad Company entered into contracts whereby the Chicago, Rock Island & Pacific Railway Company and the Chicago, Milwaukee & St. Paul Railway Company and the Chicago & Northwestern Railway Company and other roads are given the use of said bridge, its approaches and tracks, over which the trains of said several railroads are run and operated between the cities of Council Bluffs, Iowa, and South Omaha, Neb. The complainant is a corporation owning and operating a railroad having its present western terminus at Council Bluffs, in the state of Iowa, and seeks to connect with and use the said bridge, approaches, and tracks

of respondent between the said city of Council Bluffs and South Omaha, Neb., upon the same terms and conditions as a like use is granted to the other roads. Respondent refusing to grant such use to complainant, this action was brought, asking for the mandatory order of this court requiring respondent to grant to complainant the use of such bridge and tracks between Council Bluffs and South Omaha on the same terms and conditions as are given such other railroad companies.

On behalf of complainant it is asserted that it is entitled to the relief asked, first, because the right is granted by the said act of Congress of February 24, 1871; second, because of the terms of a certain tripartite agreement entered into between the city of Omaha, the county of Douglas, and said Union Pacific Railroad Company, and shown by what is known as the "Saunders Deed" of date, ———, introduced in evidence. Respondent denies that the act of Congress of February 24, 1871, required the original Union Pacific Railroad Company to afford to complainant the same use of its bridges and tracks as it gave to other railroad companies, and, further, if it did, it alleges that the title it (respondent) acquired by the foreclosure sale was freed from any such servitude, and that it is free to contract with such companies for the use of the bridge and tracks as it may see fit, and, further, that complainant has no such rights under the tripartite agreement embraced within the Saunders deed. Counsel for complainant contend that its right under the act of 1871 to the use of said bridge and tracks as against the original Union Pacific Railroad Company and the consolidated company was adjudicated and settled in the Rock Island Case, supra. If that be so—if the act has been so interpreted by the Court of Appeals and the Supreme Court—then what is the proper construction of the act is not an open one for this court, but those decisions must be followed.

In the Rock Island Case the validity of the contract then under consideration was sustained in this court in an opinion by Mr. Justice Brewer, based upon the sole consideration that at common law, and without express statutory authority, one railroad company could enter into a valid lease with another railroad company for the joint use of its tracks, when such joint use did not impair the power of the lessor company to perform the functions and duties which it owed to the public or the sovereignty from which it derived its authority. The Circuit Court of Appeals, through Judge Sanborn, approved the doctrine thus announced by Justice Brewer, and, as a further ground for holding the contract valid, construed the bridge act of 1871 in the light of other similar legislation by Congress, and held that statutory authority was given the Union Pacific to enter into such a contract. While Judge Sanborn did not in express terms say that the first section of the act of July 25, 1866, c. 246 (14 Stat. 244), was applicable to the bridge act of 1871, and hence to be read into it as a part thereof, yet a careful reading of his opinion leaves no doubt in my mind that such was the understanding of that court in its interpretation of the 1871 act. If we exclude the first section of the act of July 25, 1866, from the act of 1871, as not applicable thereto,

then it is impossible to find express statutory authority for the Union Pacific Company to have made the contract with the Rock Island Company; and I am clearly of the opinion that the holding of the Circuit Court of Appeals was not only that the contract in question was valid, as the proper exercise of the common-law right to contract, but equally as authoritative that the right was given under a proper construction and interpretation of the bridge act of 1871, and that the first section of the 1866 act was applicable to the act of 1871.

While the Court of Appeals, in construing the act of 1871 with the first section of the act of 1866, as applicable thereto, decided that authority was therein given to enter into the contract then in question, they did not in express language say that the act made it mandatory upon the Union Pacific Company to ˙grant the use of said bridge and tracks to other railroad companies. That court took one step in advance of that taken by Justice Brewer, and held that the statute authorized the making of the contract. When the case reached the Supreme Court, the Chief Justice, in pronouncing the decision of the majority, took a step in advance of that taken by the Circuit Court of Appeals, and said:

"For the provisions of the Pacific Railroad acts relating to the bridge over the Missouri river, its construction and operation, imposed on the Pacific Company the duty of permitting the Rock Island Company to run its engines, cars, and trains over the bridge and the tracks between Council Bluffs and Omaha, and we think that South Omaha was included."

In support of the correctness of this pronouncement, the bridge acts of 1871 and 1866 were considered in connection with other similar bridge acts passed by Congress. The argument advanced that section 1 of the 1866 act was inapplicable to the act of 1871, that the reference in said act of 1871 to the 1866 act should be confined to sections 2 and 3, was expressly disapproved. It is, however, urged with much force and persistency that the quoted utterance of the Chief Justice is not authority, but dicta, merely. Considering the question as to what expressions of opinion are to be treated as authority, Chief Justice Marshall, in Cohens v. Virginia, 6 Wheat. 264–399, 5 L. Ed. 257, said:

"It is a maxim not to be disregarded that general expressions in every opinion are to be taken in connection with the case in which those expressions are used. If they go beyond the case, they may be respected, but should not control the judgment in a subsequent suit when the very point is presented for decision. The reason of this maxim is obvious. The question actually before the court is investigated with care, and considered in its full extent. Other principles which may serve to illustrate it are considered in their relation to the case decided, but their possible bearing on all other cases is seldom completely investigated."

Applying this maxim to the decision of the Supreme Court, for the purpose of determining what expressions are authoritative, we are to consider what was the question before the court—what was it called upon to decide. The question before the court, and upon which it was asked to pronounce its judgment, was the validity of a contract which had been made by the Union Pacific Company; the validity of the contract having been challenged on the alleged ground

that it was beyond the power of the Union Pacific Company to make such a contract. The Court held that the contract was valid for the reasons (1) that the particular contract was one proper to be made under the common-law right to contract; (2) that the contract was authorized under the bridge act of 1871, that act, by reference, embracing the first section of the act of 1866. These two propositions are authority, within the maxim quoted. They were both proper questions to be considered and determined for a correct adjudication of the question before the court. It, perhaps, was unnecessary to place the validity of the contract upon both grounds. Its validity upon either ground would have been sufficient. That, however, does not render the decision less authoritative on both questions. The question as to whether the Union Pacific could be required against its will to enter into any character of a contract with another railroad company for the use of the bridge and tracks was not before the court in the Rock Island Case. It was not necessary to be considered for a correct determination of the question submitted, and hence the expression before quoted in the opinion of the Chief Justice, that the bridge act imposed upon the Union Pacific Company the duty of permitting the Rock Island Company to run its engines, cars, and trains over the bridge and tracks between Council Bluffs and South Omaha is not authority, but dicta, which, while it should be respected, is not to control the judgment in this case. It having been authoritatively decided by the Circuit Court of Appeals and the Supreme Court that the first section of the act of 1866 is applicable to the act of 1871, and hence to be read as a part of said 1871 act, it is left for the court in this case to determine the rights of complainant thereunder. The section reads as follows:

"That it shall be lawful for any person or persons, company or corporation, having authority from the states of Illinois and Missouri for such purpose, to build a bridge across the Mississippi river at Quincy, Illinois, and to lay on and over said bridge railway tracks, for the more perfect connection of any railroads that are or shall be constructed to the said river at or opposite said point; and that when constructed all trains of all roads terminating at said river or opposite said point shall be allowed to cross said bridge, for reasonable compensation to be made to the owners of said bridge, under the limitations and conditions hereinafter provided."

The language of the section is specific and unambiguous. It says that:

"When constructed all trains of all roads terminating at said river at or opposite said point shall be allowed to cross said bridge, for reasonable compensation to be made to the owners of said bridge."

It does not simply give to the company constructing the bridge authority to permit the trains of other roads terminating at the river to cross said bridge, but it expressly says:

"All trains of all roads terminating at said river at or opposite said point shall be allowed to cross said bridge, for reasonable compensation to be made to the owners of said bridge."

This is a mandatory provision, which was enforceable against the Union Pacific Railway Company, and equally enforceable against the respondent, unless its title and rights acquired through the foreclo-

sure proceedings before referred to were freed by such proceedings from the obligations thus imposed. It is true that the statute imposes the payment of a reasonable compensation for the use, but it is not shown or claimed that the compensation and terms imposed upon the roads which are given the use is not reasonable, and I think the act required that all roads shall be treated alike in this respect.

The amendatory act of 1864, before referred to, expressly authorized the construction of a bridge across the Missouri river (section 9, 13 Stat. 360), and by section 10 of the act the railroad company was empowered to issue its bonds and mortgage upon the road on the completion of each section, to an amount not exceeding the amount of the bonds of the United States; such bonds and mortgage to be a lien prior and superior to that of the United States. Under this provision the railroad company issued its bonds and mortgage upon the property then owned, as well as upon that to be acquired, which mortgage was given prior to the act of 1871, prior to the construction of the bridge, and prior to the mortgage given upon the bridge under the 1871 act. The mortgage thus given was one of the mortgages upon which the decree was based in the foreclosure proceeding, and it is urged on the part of respondent that such mortgage, and the interests of the holders of the bonds secured thereby, was not and could not be affected by the act of 1871, and hence the title acquired through the foreclosure sale thereunder is likewise unaffected by the act of 1871. It is to be borne in mind that, at the time this mortgage was given, the bridge had not been constructed; the company at that time simply possessing the naked right to acquire the bridge and approaches. Unable to secure the fruits of such naked right, because of lack of financial means, it applied to Congress for permission to acquire the means by a mortgage upon the bridge to be constructed. Congress granted this permission by imposing certain conditions, among which were the obligations of section 1 of the act of 1866. And this, I think, was in effect an amendment of the charter of the company which Congress had reserved unto itself the right to make.

While, as I say, the right to construct the bridge was not dependent upon the act of 1871, the right to give the mortgage by which the means were secured to construct the bridge was dependent upon that act. The provisions of the act and its conditions were accepted, as evidenced by the mortgage given upon the bridge. The result, then, was that this bridge property was acquired by the railroad company, burdened with certain conditions, among which was the provision of section 1 of the act of 1866, making it mandatory, as I have said, to permit other companies to run their trains over said bridge for just compensation.

It needs no argument to illustrate the proposition that a mortgage does not attach as a lien before the acquisition of the property, and that, where the property is acquired subject to conditions, the lien of the mortgage is also subject to such conditions. The mortgage covered not only the right of way which the company had at the time the mortgage was given, but such as it should subsequently acquire in the construction of the road. Suppose that sub-

sequent to the giving of the mortgage the company acquired the right of way over the land of A., subject to the easement of a private crossing by A. or assigns, it certainly would not be contended, I think, that the mortgage, when it attached to this right of way over the land of A., was not subject to such easement.

During the foreclosure proceedings the question as to the priority of the mortgage referred to, and the mortgage given upon the bridge to procure the means for its construction, came before Judge Sanborn for his consideration. Passing upon that question, he said:

"It is clear that, when this mortgage was made, neither the bondholders secured by the general first mortgage nor the government had any lien upon the bridge or upon the Bridge Division of the present railroad, because neither of these were then in existence. It was equally plain that neither the government nor these bondholders expected or intended that the security which they permitted the railroad company to offer in order to obtain the money to construct this bridge would be subordinate to their lien. The aggregate amount of the incumbrance upon the railroad, as it was then constructed, was more than $54,000,000. Neither the government nor the holders of the first mortgage bonds could have intended or supposed that a third lien for $2,500,000 on four miles of this railroad, subject to their liens for $54,000,000, would induce purchasers to take these bridge mortgage bonds. On the other hand, it was plainly upon the theory that the mortgage of April 1, 1871, would constitute a first lien upon the bridge and its approaches, that Congress authorized, and the first mortgage bondholders acquiesced in, its execution, and that the holders of the bridge bonds purchased them and furnished the funds which built the bridge. It would be unjust, inequitable, and a violation of the faith upon which the bridge bonds were sold, to permit the first mortgage bondholders or the government now to displace the lien of the bridge bonds, to destroy their security, and to appropriate to themselves the valuable improvement produced by the funds realized from the sale of these bridge bonds. The mortgage of April 1, 1871, must therefore be held to be a first lien upon the Bridge Division of the Union Pacific Railroad Company."

It was argued at the hearing that this decision of Judge Sanborn was based upon the finding by him that the first mortage bondholders had acquiesced in the execution of the bridge mortgage as a first lien. If the bridge mortgage was subject to conditions, and the first mortgage bondholders acquiesced in the giving of said bridge mortgage subject to such conditions, and by reason thereof the first mortgage became subject to said bridge mortgage, then, the lien of such mortgage being subsequent to and inferior as a lien to the bridge mortgage, it was subject to the same conditions as were imposed upon such bridge mortgage. It is not claimed by Judge Sanborn, in the opinion referred to, that such bridge mortgage became the first and paramount lien, upon any principle of estoppel upon the part of the first mortgage bondholders. It is upon the proposition that, as the property had not been acquired by the railroad company, Congress intended that such bridge mortgage should be the first and paramount mortgage, and that the holders of the first mortgage bonds, he says, could not have intended or supposed that the bridge mortgage was to be subject to prior mortgages, but that the theory upon which the government and all parties acted was that the bridge mortgage, from which the funds to construct the bridge were realized, was the first and paramount lien. That being so, and the bridge having been acquired by the railroad company subject to the conditions

imposed by the act, and the lien of the mortgage not attaching until the acquisition of the property, it is clear that such mortgages were subject to the conditions imposed by the act, and that the purchasers under the foreclosure decree took no greater or superior rights than were held by the mortgagees.

But it is argued that the decree of foreclosure did not impose the burden of the bridge mortgage upon the purchaser, but only the indebtedness secured thereby. I fail to observe any material distinction in that respect. Certainly, all that the holders of the bridge bonds could expect, or all that they were entitled to, was payment of their mortgage indebtedness. The question is not what rights the holders of that mortgage obtained, but whether the conditions upon which that mortgage was authorized (and which, I think, constituted an amendment of the charter to that extent) were superior to the rights of the other mortgagees, and I think such conditions were superior to the estate of any of the mortgagees. If so, then persons entitled to the benefits conferred by such conditions, who were not parties to the foreclosure proceedings, were not affected thereby, notwithstanding any recitals which the decree contained.

For these reasons, I hold that complainant possesses the same rights as against respondent to enforce the provisions of the act of 1871 as it possessed against the original and the consolidated company. This conclusion renders it unnecessary to consider the rights of the parties under the tripartite agreement embraced in the Saunders deed.

A decree will be entered for complainant. Counsel for complainant will prepare draft of decree, submit same to counsel for respondent, and the same may be presented to the court on Thursday, the 13th, at 10 o'clock a. m., when objections will be heard as to the form of the decree.