UNION PAC. RY. Co. *et al. v.* CHICAGO, R. I. & P. RY. Co.

UNION PAC. RY. Co. *v.* CHICAGO, M. & ST. P. RY. Co.

*(Circuit Court of Appeals, Eighth Circuit. July 19, 1892.)*

No. 16.

1. RAILROAD COMPANIES—CONTRACT—ULTRA VIRES—JOINT USE OF BRIDGE AND TERMINALS.

The general rule that a railroad company must itself exercise its powers and perform its public duties does not render *ultra vires* a contract by the Union Pacific Company, whereby, for 999 years, it let another company into the joint use and occupancy of its bridge across the Missouri river, and of its terminal facilities at Omaha, together with about seven miles of its track, when such joint use does not interfere with the present or prospective use thereof by the lessor, or with the discharge of the duties it owes to the government under the provisions of its charter. 47 Fed. Rep. 15, affirmed.

2. SAME—REGULATIONS FOR JOINT USE—UNION PACIFIC COMPANY—DUTIES TO GOVERNMENT.

A provision in the contract that schedules of rules for the movement of engines and trains shall be made, which will accord equal rights and privileges to the trains of the same class belonging to each party, and, if not agreed upon, shall be fixed by referees, does not disable the Union Pacific Company from exercising any powers necessary to the discharge of its public duties, especially as it expressly reserves to itself the absolute control, through its own superintendent, of the operation of every train that enters upon these tracks.

3. SAME—CHARTER POWERS—PUBLIC POLICY.

Act Feb. 24, 1871, (16 St. at Large, p. 430,) "for the more perfect connection of any railroads that are or shall be constructed to the Missouri river," authorizes the Union Pacific Company, in constructing its bridge at Omaha, to issue bonds thereon, and declares that "for the use and protection of said bridge and property" the company "shall be empowered, governed, and limited" by the act of July 25, 1866, (14 St. at Large, p. 244.) The latter act authorizes the building of a bridge across the Mississippi at Quincy, Ill., and declares that "all trains of all roads terminating at said river, at or opposite said point, shall be allowed to cross said bridge" for a reasonable compensation to its owners. Various other acts of congress authorizing the construction of bridges contain similar provisions for joint use. *Held,* that, in view of the general policy thus evinced to promote continuous lines of transportation and to foster competition, the Union Pacific Company was fairly empowered to make the contract in question, especially as one main purpose thereof was to furnish a connecting link between the parts of a road owned by the other company, which would thus form a continuous line from Chicago to Denver.

4. SAME—EXECUTION OF CONTRACT—RATIFICATION BY DIRECTORS AND STOCKHOLDERS.

The charter of the Union Pacific Railroad Company (12 St. at Large, p. 489) declares (section 1) that "the stockholders shall constitute the body politic and corporate," and provides that at any regular meeting called for that purpose they shall have power to make by-laws touching "all matters whatsoever which may appertain to the concerns of said company." In pursuance of this authority, the stockholders passed a by-law giving the board of directors the "whole charge and management of the property," and authorized it to delegate to the executive committee power to do any acts which the board itself might do. The board thereafter authorized the executive committee to exercise all the powers of the board when the board was not in session. *Held,* that the executive committee had full authority to execute a contract letting another railroad into the joint use of the company's bridge across the Missouri, and its terminals at Omaha; and such contract, having been approved by the stockholders at a regular meeting, was binding on the company, even though never ratified by a formal resolution of the board of directors; and it is immaterial that 5 of the 20 directors are appointed by the government, and not by the stockholders. 47 Fed. Rep. 15, affirmed.

5. SAME—ESTOPPEL—PARTIAL PERFORMANCE.

The fact that this contract was within the corporate powers of the Union Pacific Company, and was executed with all proper formalities and delivered to the other company, together with a formal resolution of approval by the stockholders, constituted *prima facie* evidence that it was executed with lawful authority; and after carrying it out for seven months, and receiving the stipulated monthly rent-

als, and after the other company had made large expenditures on the faith thereof,. the Union Pacific Company was estopped to deny its validity, because it was never formally approved by the board of directors, or because the calls for the meetings of the executive committee and of the stockholders, respectively, at which the contract was approved, gave no notice that this business would come up for consideration.

**6. SAME—CONTRACT FOR 999 YEARS—EFFECT OF EXPIRATION OF CHARTER.**
The fact that the contract was for 999 years, while the charter of the plaintiff company would expire in about 40 years, did not render the contract void, especially as the charter contained a provision that it might be renewed from time to time, and as the contract was expressly made binding upon the assigns and successors of the parties.

**7. SAME—CONSIDERATION—TO WHOM PAID.**
Where one railroad company owns substantially all the stock and bonds of another railroad company, a lease of the latter's line for rent to be paid to the former company is not void for want of consideration, since the rent goes to the real owner. 47 Fed. Rep. 15, affirmed.

**8. SAME—SPECIFIC PERFORMANCE—EVIDENCE—DISCRETION OF TRIAL COURT.**
In a suit for specific performance of a contract, whereby defendant railroad company agreed to let plaintiff company into the joint use of its bridge across the Missouri river between the states of Iowa and Nebraska, it was within the discretion of the trial court to deny a motion made at final argument, after the testimony had been closed, to permit the introduction of evidence that plaintiff had never complied with the Nebraska statutes prescribing the conditions on which it was entitled to enter the state, and that, therefore, the contract was not mutually enforceable.

**9. SAME—SPECIFIC PERFORMANCE.**
The specific performance of a contract, whereby one railroad lets another into the joint use of its bridge and terminals, will not be refused because the acts to be performed are numerous and complicated, and are to extend through a long term of years. *Joy* v. *City of St. Louis,* 138 U. S. 1, 11 Sup. Ct. Rep. 243, followed. 47 Fed. Rep. 15, affirmed.

**10. SAME—PROVISION FOR ARBITRATION.**
The general rule that an agreement to submit a controversy to arbitration cannot be specifically enforced will not prevent the enforcement of the contract between the two companies; it appearing that the stipulation to submit to referees is not of the essence of the agreement, but relates merely to differences that may arise respecting the minor details of its execution.

**11. SAME—ADEQUACY OF CONSIDERATION.**
The contract having been entered into, on the part of the Union Pacific Company, by men of long experience in railroad affairs, who had the best means of information regarding the subject-matter, at rentals named by them, acting in good faith, and for the purpose of preventing the construction of a rival bridge then in contemplation by the plaintiff and another company, and the plaintiff company having expended over $1,000,000 in the construction of a connecting line, specific performance of the contract will not be refused on the ground of an alleged inadequacy of consideration. 47 Fed. Rep. 15, affirmed.

Appeal from the Circuit Court of the United States for the District of Nebraska. Affirmed.

Statement by SANBORN, Circuit Judge:

These were suits brought by the appellees in the district court of Douglas county, Nebraska, in January, 1891, to compel the specific performance of two contracts, dated May 1, 1890. The suits were immediately removed on petition of appellants to the United States circuit court for the district of Nebraska, where they were heard by Mr. Justice BREWER, and decrees entered for appellees, from which these appeals are taken.

To one of these contracts the Union Pacific Railway Company, the Omaha & Republican Valley Railway Company, and the Salina & Southwestern Railway Company are parties on one side, and the Chicago, Rock Island & Pacific Railway Company and the Chicago, Kansas & Nebraska Railway Company, on the other. The other contract was between the Union Pacific Railway Company and the Chicago, Milwaukee & St. Paul Railway Company. In this statement, and in the opinion, the Union

Pacific Railway Company is called the "Pacific Company;" the Omaha & Republican Valley Railway Company, the "Republican Valley Company;" the Salina & Southwestern Railway Company, the "Salina Company;" the Chicago, Rock Island & Pacific Railway Company, the "Rock Island Company;" the Chicago, Kansas & Nebraska Railway Company, the "Kansas Company;" and the Chicago, Milwaukee & St. Paul Railway Company, the "St. Paul Company." The Pacific Company owned nearly all the stock and bonds, elected the directors, and built, controlled, and operated the railroads of the Republican Valley and Salina Companies; and the Rock Island Company operated the roads of the Kansas Company under a lease for 999 years; so that in reality the Pacific Company and the Rock Island Company were the only parties in interest in the Rock Island Company's contract.

The negotiations that led to these contracts commenced about the 1st of March, 1890, and the contracts were formulated and signed by the various officers of the corporations before the middle of May in that year. The Pacific Company at this time controlled and operated more than 5,000 miles of railroads; among others, a main line extending from Council Bluffs, Iowa, by way of Omaha and Valley Station. Neb., to Ogden, in Utah territory, a distance of about 1,100 miles; a main line from Kansas City, Mo., by way of Topeka and Salina, Kan., to Denver, Colo.; the Republican Valley Railroad, extending from Valley Station, Neb., by way of Lincoln and Beatrice, in that state, to Manhattan, Kan.; the Salina Company's railroad, extending from Salina to McPherson, in Kansas; a railroad extending from Hutchinson, Kan., to the southern border of that state; and other auxiliary roads. The Rock Island Company owned and operated a line of railway extending from Chicago, by way of Davenport, to Council Bluffs, Iowa, and from Davenport to St. Joseph, Mo. As the owner of the latter line, and lessee of the railroads of the Kansas Company and other corporations, it controlled and operated a through line of railway from Chicago, by way of Davenport, Iowa, St. Joseph, Mo., and Beatrice. Neb., to Colorado Springs and Denver, Colo.; a line from St. Joseph, Mo., by way of Horton, Topeka, and Hutchinson, to Liberal, Kan.; and such other lines that it controlled and operated, in the aggregate, more than 3,000 miles of railway. The St. Paul Company was operating more than 6,000 miles of railroad, and one of its lines extended from Chicago to Council Bluffs, Iowa.

Early in 1890 the Rock Island Company determined to connect its line from Chicago to Council Bluffs with its more southerly line to Colorado Springs by constructing a bridge across the Missouri river at Council Bluffs, and a railroad from its terminus in that state, by way of Omaha, South Omaha, and Lincoln to Beatrice, Neb., thereby shortening its line from Chicago to Denver and Colorado Springs; and the St. Paul Company joined in the undertaking in order to extend its line from Chicago to Council Bluffs on to Omaha and South Omaha. To accomplish this purpose, these companies caused a corporation, with the necessary powers, to be created, obtained for it by act of congress the nec-

essary franchise to build and operate the bridge, made the preliminary surveys and estimates, showing the probable cost of construction to be about $2,500,000, and were proceeding to raise the necessary funds when the Pacific Company requested them to suspend operations, and proposed to make a trackage arrangement with them by which they could use the bridge and certain tracks of the Pacific Company between Council Bluffs and South Omaha for their terminal facilities in Omaha and South Omaha, and to complete the continuous line desired by the Rock Island Company. By direction of the president and at least two of the directors of the Pacific Company, its chief of construction and two of its directors requested and obtained a meeting with the presidents of the Rock Island and the St. Paul Companies, and there agreed with them upon the terms of the contracts in question. From memoranda there made by the chief of construction of the Pacific Company, the contracts were subsequently drawn. They were examined and approved by the general solicitor of the Pacific Company at Omaha. The executive committee of the board of directors of that company had a meeting on April 22, 1890, at which six of the seven members of that committee were present, considered and unanimously voted to approve of the contracts and authorize the president to execute them; but the custom of the secretary had been not to specify in the calls of the meetings of this committee the subjects to be considered thereat, and the call of this meeting did not state that the subject-matter of these contracts would be there considered. At the annual meeting of the stockholders of this company held on the 30th day of April, 1890, at which more than two thirds of the stock was represented, these contracts and the action of the executive committee thereon were considered, and resolutions unanimously passed approving and ratifying the contracts and the action of the committee authorizing their execution; but the call of this annual meeting did not state that the subject-matter of these contracts would be considered thereat, but stated that certain other subjects were to be considered, and that the meeting was "for the choice of directors for the coming year, and the transaction of any other business which may legally come before the meeting." The resolution approving the contract with the Rock Island Company read as follows:

"Resolved, that the agreement between the Union Pacific Railway Company, the Omaha and Republican Valley Railway Company, the Salina and Southwestern Railway Company, and the Chicago, Rock Island and Pacific Railway Company, and the Chicago, Kansas & Nebraska Railway Company, dated May 1, 1890, (a copy of which is herewith submitted,) granting to the two last-named companies trackage rights over this company's lines from Council Bluffs to Omaha, including the Omaha bridge, and the lines of this company's Omaha and Republican Valley branch, from Lincoln to Beatrice, Nebraska, and providing, further, for the use by this company of the Chicago, Kansas and Nebraska Railway Company's lines between McPherson and South Hutchinson, Kansas, and the line from South Omaha to Lincoln, Nebraska, on the terms therein provided for, be and is hereby approved, and the action of the executive committee in authorizing the execution thereof is hereby ratified, approved, and confirmed."

The president of the Pacific Company signed and acknowledged the contracts on behalf of that company, and the secretary attested them and affixed the corporate seal thereto.    The contracts so executed, with copies of the resolution of the meeting of the stockholders approving and ratifying them, were immediately delivered to the Rock Island Company and the St. Paul Company, and the Pacific Company immediately entered upon the enjoyment of the portion of the contract beneficial to itself.    It is conceded that the board of directors and the body of the stockholders of each corporation that is a party to these contracts, the Pacific Company alone excepted, took proper action to authorize or ratify the execution of the contracts of their respective corporations, and that the formal execution of the contracts by all the parties to them was sufficient.    These contracts are long, and only those stipulations that are material to the determination of the questions presented here will be stated.    The contract with the Rock Island Company provides that "the Pacific Company hereby lets the Rock Island Company into the full, equal, and joint possession and use of its main and passing tracks now located and established, or which may be hereafter located and established, between the terminus of such tracks in the city of Council Bluffs, in the state of Iowa, and a line drawn at a right angle across said tracks within one and one half miles southerly from the present passenger station of South Omaha, in the state of Nebraska, including the bridge on which said tracks extend across the Missouri river, between said cities of Council Bluffs and Omaha; connections with Union Depot tracks in Omaha, the side or spur track leading from its main tracks to the lower grade of the Pacific Company's sidings and spur tracks in Omaha, and such extension thereof as may be hereafter made; side tracks in Omaha on which to receive and deliver to the Rock Island Company freight that may be handled through the warehouses or switched by the Pacific Company; the connections with the Union Stock Yards at South Omaha, and conveniently located grounds in South Omaha, on which the Rock Island Company may construct, maintain, and exclusively use a track or tracks three thousand (3,000) feet in length for the storage of cars and other purposes, for the term of nine hundred and ninety-nine (999) years, commencing on the first day of May in the current year; for which possession and use the Rock Island Company covenants to pay to the order of the said Pacific Company monthly, during the continuance of said term, the sum of three thousand seven hundred and fifty dollars;" and a certain proportion of the cost of maintaining some of the tracks to be so used; and that the Pacific Company lets the Rock Island Company into the full, joint, and equal possession and use of its tracks, stations, and appurtenances along the line of railway of the Republican Valley Company from a point near the northern boundary of the city of Lincoln to the point where its tracks connect with those of the Kansas Company at Beatrice, Neb., for the same length of time, for which the Rock Island Company agrees to pay the Pacific Company a certain rental computed on a percentage of

the value of the main track, and a proportion of the cost of maintenance; that the Rock Island Company lets the Pacific Company into the full, joint, and equal possession and use of its tracks and stations along the lines of the Kansas Company from McPherson to Hutchinson, for the same length of time for a rental to be computed in the same way; that the Rock Island Company lets, leases, and demises to the Pacific Company for a like term, commencing October 1, 1890, the right to move and operate over the tracks of the railway it proposes to construct between the cities of South Omaha and Lincoln, in the state of Nebraska, its passenger and freight trains, engines, and cars of all classes, for a rental based upon the mileage of the trains; that each of the parties to the contract shall take such steps as will be necessary to continue all the stipulations of the contract in force; that each contract of lease shall attach to that portion of the railway leased during the corporate existence of the owner thereof, and all extensions of such existences by renewal or otherwise; and that the contract shall bind the parties thereto, their successors, grantees, and assigns.    That "schedules of rules and regulations for the movement of engines and trains over the several railways hereby let and demised shall be made for each railway by the duly-authorized officers of the lessor and lessee company by which said railways shall at the time be operated.    Such schedules shall, as nearly as may be practicable, accord equality of right, privilege, and advantage to trains of the same class operated by the lessor and lessee, and to trains of a superior class operated by either a preference over trains of an inferior class operated by the other.    All rules and regulations shall be reasonable and just to both lessor and lessee, and shall secure to neither any preference or discrimination against the other.    They shall be executed and all trains moved under the immediate direction of the superintendent or other officer of the lessor company.    If the parties cannot agree upon the adoption of any schedule, rule, or regulation, or as to the modification of any one existing, either party may demand a decision of such controversy by referees, as hereinafter provided.    The referees are hereby invested with power to prescribe schedules, rules, and regulations, and to modify existing ones; and, in case of willful disregard by either party of the rights of the other, to award damages to the party injured for injuries sustained because of such willful act;" and that the referees shall be appointed when needed by the selection of one by each party, and the appointment of a third by the two so chosen, with further provision for their action in case of disagreement, not material here.

This agreement upon the construction of its proposed line from South Omaha to Lincoln gave the Rock Island Company access to Omaha and South Omaha, and a shorter continuous line from Chicago to Denver, by way of Council Bluffs, Lincoln, and Beatrice, than it had by its more southern route; while by the use of the proposed railroad from South Omaha to Lincoln it gave the Pacific Company a line from Omaha to Lincoln and Beatrice about 40 miles shorter than its former route by way of Valley Station, and by its use of the railway from Mc-

Pherson to Hutchinson it filled the gap in the Pacific Company's line there, gave it a continuous line from Omaha, by way of Salina, to the southern boundary of Kansas, and a rental of $45,000 a year.

The contract with the St. Paul Company lets it into the joint and equal use of the bridge and tracks of the Pacific Company between Council Bluffs and South Omaha, for the same time and on the same terms named in the contract with the Rock Island Company. The main tracks of the Pacific Company covered by this contract were two, extending a distance of about seven miles from Council Bluffs across the bridge and through the city of Omaha to South Omaha.

Under the contract with the Rock Island Company the Pacific Company immediately entered upon and continued to use the tracks of the Rock Island Company between McPherson and Hutchinson until some time in January, 1891, and the Rock Island Company before December 1, 1890, constructed its railroad from South Omaha to Lincoln and such depots and buildings at those cities as were necessary and useful only in connection with the use of the Pacific Company's railroads at South Omaha and Lincoln in the way provided in this contract; and the St. Paul Company under its contract entered about June 1, 1890, upon and continued to use the bridge and tracks between Council Bluffs and South Omaha, until some time in January, 1891. Early in January, 1891, the Pacific Company forcibly prevented the use by the Rock Island Company and St. Paul Company of its tracks at Omaha, which they were entitled to use under the contract, and absolutely refused to perform the contract. Thereupon these suits were commenced. These contracts are not inequitable or unconscionable. The president of the Pacific Company instructed his agents who negotiated them to ask but $50,000 rental per annum for the privileges granted by each of these contracts, and further instructed them not to fail to make the contracts if they could get a rental of $45,000 per annum. This they did get. The complete performance of these contracts does not, and will not, at least for many years, if ever, prevent the Pacific Company from discharging every duty to the government and the public imposed by its charter or demanded by public policy; its facilities are ample to transport all the freight and passengers it can obtain, and to perform these contracts to the letter, without delay or serious inconvenience to itself or the public.

The charter of the Rock Island Company will expire in the year 1930, if not renewed; but reserves to the company the right to renew its charter from time to time, "as may be provided by the laws of the states of Illinois and Iowa."

The defenses to these suits and objections to these decrees therein now urged are—*First*, that these contracts are *ultra vires* of the Pacific Company; *second*, that the Pacific Company is not bound by them, because they were not authorized by formal action of its board of directors; *third*, that the contracts are *ultra vires* of the Rock Island Company and of the St. Paul Company; *fourth*, that the contract with the Rock Island Company is void, because its charter expires in

1930, and it could not contract beyond the stated period of its own existence; *fifth*, that the contract with the Rock Island Company is void as to the Republican Valley Company, because it does not provide for the payment to that company of any consideration for the use of its railroad; *sixth*, that specific performance of these contracts cannot be decreed in equity, because the acts to be performed under them are so numerous and complicated, and to be performed through such a long term of years, that it is impracticable for a court of equity to supervise and enforce their provisions; *seventh*, that the contracts are inequitable and were improvidently made, and no court of equity ought to enforce them.

The opinion of Mr. Justice BREWER upon the hearing below is reported in 47 Fed. Rep. 15. All the objections urged against the contract and decree involved in the suit by the St. Paul Company are urged against and equally affect the contract and decree in the suit brought by the Rock Island Company, and the latter only will be considered in the opinion.

*John M. Thurston* and *A. L. Williams*, (*John F. Dillon*, of counsel,) for appellants.

*Thomas F. Withrow* and *J. M. Woolworth*, (*A. J. Poppleton*, *M. A. Low*, *John W. Cary*, and *John T. Fish*, of counsel,) for appellees.

Before CALDWELL and SANBORN, Circuit Judges, and SHIRAS, District Judge.

SANBORN, Circuit Judge, after stating the facts as above, delivered the opinion of the court.

The principal question in this case is whether this contract of May 1, 1890, is *ultra vires* of the Pacific Company. The Union Pacific Railway Company is a consolidation, under authority of the act of congress of July 1, 1862, of the Union Pacific Railroad Company, the Kansas Pacific Railway Company, and the Denver Pacific Railway & Telegraph Company. It has succeeded to all the rights and powers granted to the Union Pacific Railroad Company by the acts of congress of July 1, 1862, (12 St. at Large, p. 489,) July 2, 1864, (13 St. at Large, pp. 356, 362,) February 24, 1871, (16 St. at Large, p. 430,) and the various acts amendatory thereof; and in determining the extent of its powers and the validity of this contract these acts of congress must be read in the light of any general legislation fairly applicable. *Central Transp. Co.* v. *Pullman's Palace Car Co.*, 139 U. S. 24, 48, 11 Sup. Ct. Rep. 478. It is conceded that the powers thus granted, together with those fairly incidental thereto, are the only powers of this corporation, and that all powers not thus granted are reserved to the state. Corporations created under statutory authority are the creatures of the statute. By it their powers are measured. Beyond the limits of the powers there granted, and those fairly incidental thereto, they may not act; they may not agree to act. Their contracts for the just exercise of these powers are binding and enforceable; but their contracts beyond the scope of these granted powers are null,—are as though they had not been. They are void as

against the state, because they are unlawful usurpations of powers reserved by the state. They are void as against other parties to the contracts, because they are bound to take notice of the law, of the limits of corporate powers there found; and no formal assent of corporations or officers, no alleged estoppel, can give validity to such contracts, or induce the courts to enforce them, against the objection of the citizen or the state.

Another settled proposition is that the consideration derived by the state from the grant of a railroad franchise is the performance of the functions pertaining to the exercise of the powers so granted. So far as the state and the public are concerned, the sole purpose of the grant is to obtain from the corporation a performance of these functions and a proper exercise of these powers; hence any contract or conveyance of the corporation by which, without legislative authority, it disables itself from the performance of these functions and from the exercise of its corporate powers is against public policy and void. Such a corporation may not accept the privilege and benefit without accepting the burden and duty imposed by the franchise. It may not absolve itself from the performance of those duties to the public whose performance is the only remuneration to the state for the franchise granted. *Thomas* v. *Railroad Co.*, 101 U. S. 71; *Pennsylvania R. Co.* v. *St. Louis, etc., R. Co.*, 118 U. S. 290, 6 Sup. Ct. Rep. 1094; *Oregon Ry. & Nav. Co.* v. *Oregonian Ry. Co.*, 130 U. S. 1, 9 Sup. Ct. Rep. 409; *Central Transp. Co.* v. *Pullman's Palace Car Co.*, 139 U. S. 24, 11 Sup. Ct. Rep. 478.

Upon these principles and authorities is based the contention that this contract is void. The clause of the contract deemed most obnoxious is that which lets the Rock Island Company into the equal joint possession and use of the two main tracks of the Pacific Company between Council Bluffs and South Omaha for 999 years, and it is argued that by this contract the Pacific Company has attempted to abandon or alienate a part of its franchise, and that this attempt avoids this contract. Let us examine these authorities, and see if they warrant this conclusion.

In the leading case of *Thomas* v. *Railroad Co.*, 101 U. S. 79, a railroad corporation had leased its railroad and all its appurtenances and franchises, including the right to do the business of a railroad and collect the proper tolls therefor. Mr. Justice MILLER, delivering the opinion of the court, says: "The provision for the complete possession, control and use of the property of the company and its franchises by the lessees was perfect. Nothing was left to the lessor but the right to receive rent. No power of control in the management of the road or in the exercise of the franchises of the company was reserved;" and the court held the lease void, because it totally disabled the lessor from performing any of the functions pertaining to the exercise of its corporate powers.

In *Pennsylvania R. Co.* v. *St. Louis, etc., R. Co.*, 118 U. S. 290, 309, 6 Sup. Ct. Rep. 1094, a lease by a railroad corporation, by special legislative authority, of its entire railroad and appurtenances to a railroad corpo-

ration having no legislative authority to take such a lease, was held void by Mr. Justice MILLER upon the following principle, which he announced after referring to some of the previous decisions:

"As the just result of these cases, and on sound principle, unless specially authorized by its charter, or aided by some other legislative action, a railroad company cannot, by lease or any other contract, turn over to another company for a long period of time its road and all its appurtenances, the use of its franchises, and the exercise of its powers; nor can any other railroad company, without similar authority, make a contract to receive and operate such road, franchises, and property of the first corporation."

In *Oregon Ry. & Nav. Co.* v. *Oregonian Ry. Co.*, 130 U. S. 1, 23, 9 Sup. Ct. Rep. 409, a lease by the Oregonian Railway Company, Limited, of its entire railroad and all its franchises for 96 years was held void on the same ground, viz., that it disabled the lessor to perform its corporate functions. In *Central Transp. Co.* v. *Pullman's Palace Car Co.*, 139 U. S. 26, 49, 11 Sup. Ct. Rep. 478, the Central Transportation Company was incorporated for "the transportation of passengers in railroad cars, constructed and to be owned by the said company." It erected suitable buildings and entered upon the manufacture and operation of sleeping cars. After some years it made a contract with the Pullman Car Company, by which it transferred and leased to the Pullman Company all of its personal property, patents, and contracts for 99 years, and covenanted not to engage in the business for the prosecution of which it was incorporated during that time. With delightful clearness and brevity Mr. Justice GRAY reviewed the decisions of the supreme court, and held the contract void, because it deprived the transportation company for a long period of time of the power to perform its corporate functions.

It is idle to review the authorities referred to in these decisions in support of this proposition, or the cases involving the telegraph franchises of the Pacific Company, to which reference is made by counsel. It is sufficient to say that in every case to which the learning and research of counsel has been able to refer us, where such a contract has been held void, an attempt was made to transfer absolutely, or for a long term of years, either the entire property and franchises of the corporation, or so large and substantial a part of them that it disabled the corporation from the performance of its obligations and duties to the government and to the public.

Clearly, the contract here in question does not come under the ban of these decisions. So far as the main line of the Pacific Company's road from Council Bluffs to Ogden is concerned, this contract covers but about seven miles of double track on a line of 1,032 miles, part of a system of over 5,000 miles of railroad operated by this company. These tracks are at one of its terminals, at the junction of three great systems of railroad, aggregating more than 14,000 miles in extent, at the crossing of the Missouri river where three large cities stand. Courts cannot be blind to the fact that every railroad company cannot have

entrance to our great cities over tracks of its own, or to the fact that railroad companies do, and every public interest requires that they should, make proper contracts for terminal facilities over the roads of each other.

The provision in this contract that schedules of rules for the movement of engines and trains shall be made by the parties, which will accord equal rights and privileges to the trains of the same class belonging to each party, and if not agreed upon, shall be fixed by referees, disables the Pacific Company from the exercise of no power necessary to the discharge of its public duties. It is but the usual and necessary provision commonly found in contracts for terminal facilities. The same provision requires such rules and regulations to be "reasonable and just," and this puts their determination peculiarly within the province of a court of equity, where injustice will not be done. *Joy* v. *City of St. Louis,* 138 U. S. 43, 11 Sup. Ct. Rep. 243; *Brown* v. *Bellows,* 4 Pick. 189; *Gregory* v. *Mighell,* 18 Ves. 328; *City of Providence* v. *St. John's Lodge,* 2 R. I. 46, 57; *Dike* v. *Greene,* 4 R. I. 285. Only about one seventh of the capacity of these tracks was used in 1891, and the full performance of both contracts will not now exhaust their capacity or deprive the Pacific Company of any facility necessary for the discharge of its duties to the government or the public; nor will the speculative possibility that at some future day the full performance of these contracts may wrong some one prevail upon this court to do injustice to either party now. It is by no means clear that the tolls of the Pacific Company between Council Bluffs and South Omaha will be diminished any more by the performance of this contract than they would be by the operation by the Rock Island Company of a parallel railroad of its own construction between those cities; while it is certain that the Pacific Company will receive under the two contracts $90,000 per annum that it would not obtain in that event. That the term of the contract is long might weigh as an objection if it was vicious or hurtful in itself, but, if it is fair to the parties and beneficial to the public interests, its length is but an added argument in its favor. By this contract the Pacific Company does not surrender or transfer any part of its road or property; on the other hand, it retains their possession, and reserves to itself, by the express terms of the contract, the absolute control, through its own superintendent, of the operation of every train of every company that enters upon these tracks.

That the Pacific Railway Company Acts reserved to the government the preference in the use of this railroad is not material to this discussion, for two reasons: That if the entire use of the Pacific Company was subject to this charter provision, the joint and equal use, which alone that company lets, must be; and that the record satisfies us that with the contracts in operation the Pacific Company still retains every facility necessary to the discharge of its corporate obligations to the government and all its other patrons.

That these acts require the Pacific Company to maintain and operate the Omaha bridge as a part of a continuous line of railroad from

Council Bluffs to Ogden cannot be material to the determination of this question, because this contract does not deprive it of that power; and it cannot be successfully contended that, after the through traffic upon this continuous line is fully accommodated, it has not also authority to use this bridge or any other part of its line for local traffic.

The Pacific Company in its answer offered to transport all the cars and trains of the Rock Island Company to and from all points on its lines described in the contract, and alleged that it "thereby enabled the complainant to maintain its business at Omaha and South Omaha, and to carry on exactly the same business that it could have carried on by the operation of its own trains, by its own engines, and by its own employes, as provided in said supposed contract." This would seem to reduce the contention to this: that permitting the use of these tracks of this railroad for the traction of the trains of the Rock Island Company by its own engines is an unlawful alienation of a part of the Pacific Company's franchise; but permitting the use of the tracks, crews, and engines of the Pacific Company for the traction of the same trains is a lawful exercise of its powers. The truth is—and the absurdity of this position well illustrates it—that by this contract no part of the franchise is transferred or attempted so to be; the Pacific Company still retains and exercises the power to operate its trains and collect its tolls between Council Bluffs and South Omaha to the same extent as before the contract was made. The franchise to operate its trains and collect its tolls between these points, which the Rock Island Company exercises, is derived, not from the Pacific Company, but from the state. It had this power before the contract; it might have exercised it on a parallel railroad built by itself; being allowed the use of the Pacific Company's tracks, it exercises it on those tracks.

The general proposition that a railroad corporation must itself exercise its powers and perform its public duties is sound in principle and settled by authority, but this rule does not require it to do every act itself that it can lawfully do, or prohibit it, after the full performance of those duties, from utilizing all the surplus property it has necessarily acquired for the purposes of its incorporation. Thus it is within the powers of this corporation to build its own cars and engines, but it is not required so to do; it may hire them built; it may buy them; it may rent them. It is within its powers to sell all its tickets, make all its contracts for freightage, and collect all its tolls itself, but it is not required so to do; and it is equally within its powers to delegate to other corporations or parties the right to make these contracts. It was undoubtedly within the powers of this corporation in this case to permit the use of its engines, crews, and tracks to the Rock Island Company for the transportation of its trains over these tracks; but it was equally within those powers to permit the use of these tracks for the transfer of the same trains when propelled by the engines of the Rock Island Company. In which way in this case these powers should be exercised was left to the determination of the managers of the corporation. It was a

mere question of method, not of authority, and whether in this case these managers have determined this question wisely or not is not material to the determination of the question we are now considering.

If, in the conduct of its corporate business, a railroad corporation necessarily acquires engines and cars that at certain seasons of the year are not required for its own use, it is not then required to operate them; it is not required to hold them in idleness; it may rent them; it may sell them; and, if it necessarily constructs or acquires for its corporate purposes bridges, tracks, and depots at its terminals whose capacity is greater than its corporate use, the interest of its stockholders and creditors, the value of whose property will be thereby enhanced, and the interest of the public, who will be thereby provided with increased facilities for transportation, alike require that such surplus use shall not be left to idle waste. *Brown* v. *Winnisimmet Co.*, 11 Allen, 326, 334; *Midland R. Co.* v. *Great Western R. Co.*, 8 Ch. App. 841, 851; *Simpson* v. *Hotel Co.*, 8 H. L. Cas. 712; *Hendee* v. *Pinkerton*, 96 Mass. 381, 386. The result is that it is not beyond the powers of a corporation authorized to construct, maintain, and operate a railroad and its appurtenances to let by contract to a like corporation its surplus rolling stock, or the surplus use of its terminal tracks, depots, and bridges, which it has necessarily acquired for the purposes of its incorporation: provided, always, that such contract in no way disables it from the full performance of its obligations and duties to the state and the public. The contract here in question is clearly within this rule, and is not *ultra vires* of the Pacific Company.

There is another ground upon which this contract must be held to be within the powers of this corporation. By the first section of the act of July 1, 1862, (12 St. at Large, p. 489,) the Union Pacific Railroad Company was authorized to construct, maintain, and enjoy a continuous railroad and telegraph from a point on the one hundredth meridian of longitude west from Greenwich to the western boundary of the territory of Nevada. By the fourteenth section of the act that company was authorized and required "to construct a single line of railroad and telegraph from a point on the western boundary of the state of Iowa, * * * so as to form a connection with the lines of said company at some point on the one hundredth meridian of longitude aforesaid from the point of commencement on the western boundary of the state of Iowa." Other provisions were made for eastern connections with St. Louis and Sioux City. In *Railroad Co.* v. *Hall*, 91 U. S. 345, speaking of these provisions, the supreme court said:

"Thus provisions were made for the Iowa eastern branch of the main line. It was doubtless intended to render possible a connection with any railroad that might thereafter be constructed from the western boundary of Iowa eastward. * * * The scheme of the act of congress, then, is very apparent. It was to secure the connection of the main line, by at least three branches, with the Missouri and Iowa railroads, and with a railroad running eastwardly from Sioux City, in Iowa, either through that state or through Minnesota."

And again:

"From it [that is to say, the Pacific Company's charter] may reasonably be inferred that the purpose of congress was to provide for connection of the branches of the main line of the *Union Pacific road* with railroads running through the states on the east of the territory, and to provide for those connections within those states, at points at or near their western boundaries." Page 346.

The ninth section of the act authorized each of the corporations named therein to construct bridges over the Missouri river, and the fifteenth section required the railroads and branches constructed under the act to be used as one connected, continuous line. By act of congress approved March 24, 1871, (16 St. at Large, p. 430,) it is provided:

"That for the more perfect connection of any railroads that are, or shall be, constructed to the Missouri river, at or near Council Bluffs, Iowa, and Omaha, Neb., the Union Pacific Railroad Company be, and it is hereby, authorized to issue such bonds, and to secure the same by mortgage on the bridge, and approaches and appurtenances, as it may deem needful to construct and maintain its bridge over said river, and the tracks and depots required to perfect the same, as now authorized by law of congress; and said bridge may be so constructed as to provide for the passage of ordinary vehicles and travel, and said company may levy and collect tolls and charges for the use of the same; and, for the use and protection of said bridge and property, the Union Pacific Railway Company shall be empowered, governed, and limited by the provisions of the act entitled ' An act to authorize the construction of certain bridges, and to establish them as post roads,' approved July twenty-five, eighteen hundred and sixty-six, so far as the same is applicable thereto."

The act of July 25, 1866, (14 St. at Large, p. 244,) provided by its first section:

"That it shall be lawful for any person or persons, company or corporation, having authority from the states of Illinois and Missouri for such purpose, to build a bridge across the Mississippi river at Quincy, Illinois, and to lay on and over said bridge railway tracks, for the more perfect connection of any railroads that are or shall be constructed to the said river at or opposite said point; and that when constructed all trains of all roads terminating at said river at or opposite said point shall be allowed to cross said bridge, for reasonable compensation to be made to the owners of said bridge, under the limitations and conditions hereinafter provided."

By sections 4, 5, 6, 7, 8, 9, and 10 of this act certain parties are authorized to construct bridges at Burlington, Iowa, Hannibal, Mo., Prairie du Chien, Wis., Keokuk, Iowa, Winona, Minn., Dubuque, Iowa, and Kansas City, Mo., on the same terms and subject to the same restrictions.

By act of congress approved February 21, 1868, (15 St. at Large, p. 37,) the Southern Minnesota Railroad Company was authorized to build and operate a railroad bridge across the Mississippi river, subject to the provisions of the act of 1866. On June 30, 1870, (16 St. at Large, p. 173,) an act authorizing a railroad bridge across the Niagara river provided that " all railway companies desiring to use the said bridge shall have and be entitled to equal rights and privileges in the passage of the same, and in the use of the machinery and fixtures thereof, and of all the ap-

proaches thereto." And in the Statutes at Large, from the seventeenth volume to the present time, is found a large number of statutes of this character, in nearly, if not quite, all of which this or a similar provision is found. By an act of congress approved June 15, 1866, (14 St. at Large, p. 66,) it was provided:

"That every railroad company in the United States whose road is operated by steam, its successors and assigns, be, and is hereby, authorized to carry, upon and over its road, boats, bridges, and ferries, all passengers, troops, government supplies, mails, freight, and property on their way from any state to another state, and to receive compensation therefor, and to connect with roads of other states so as to form continuous lines for the transportation of the same to the place of destination."

An examination of these statutes clearly shows that the purpose and policy of the congress has been constantly to promote, and often to require, the formation and operation of continuous lines of transportation; that almost without exception it has authorized, and generally has required, the owners of railroad bridges built under its authority to allow the use of their bridges and tracks for the passage of trains of connecting companies. It is seen that the bridge act of 1866, by which the Pacific Company, so far as the same was applicable, was "empowered, governed, and limited" for the use and protection of its Omaha bridge, was an act whose restrictions and conditions have been made applicable to at least eight bridges; and that the expressed purpose of the act of February 24, 1871, was "for the more perfect connection of any railroads that are or shall be constructed to the Missouri river."

In *Union Pac. Ry. Co. v. U. S.*, 117 U. S. 355, 361, 6 Sup. Ct. Rep. 772, the supreme court, speaking of the act of 1871, which they there held did not change the rates of compensation expressly fixed in the act of 1862 for the transportation of mail, troops, and government supplies across the Omaha bridge, said:

"The reference in the last-named act to the act of 1866 was for the purpose of extending the provisions of the latter act as far as necessary to confer additional powers upon the railway company for the use and protection of the bridge."

In *Pittsburgh, etc., Ry. Co. v. Keokuk & H. Bridge Co.*, 131 U. S. 371, 9 Sup. Ct. Rep. 770, Mr. Justice GRAY, speaking for that court, says:

"Where the charter of a railroad corporation, or the general laws applicable to it, manifest the intention of the legislature for the purpose of securing a continuous line of transportation, of which its road forms a part, to confer upon it the power of making contracts with other railroads or steamboat corporations to promote that end, such contracts are not *ultra vires*." *Green Bay & M. R. Co. v. Union Steamboat Co.*, 107 U. S. 98, 2 Sup. Ct. Rep. 221.

The great purpose of the contract here in question was to fill the gap in the line of the Rock Island Company between Council Bluffs and Beatrice, and thus establish a continuous line of railroad from Chicago, by the way of Omaha and Beatrice, to Denver, Colo. It is true that that line would be a competitor of the Pacific Company, but the course

of legislation and decision, the public policy of this nation, is to foster, not repress, competition; it is to promote, not repress, continuous lines of transportation; and, reading the charter of this company in the light of the general legislation to which we have referred, we are constrained to hold that the Union Pacific Railway Company was thereby fairly empowered to make this contract.

The second defense to this suit and objection to this decree is that this contract was never authorized to be executed by proper action of the board of directors of the Pacific Company. The contention is that in the board of directors was vested the whole charge and management of the property and effects of the Pacific Company; that the action of the executive committee of the board was futile, because the power to make this contract could not be delegated; that the action of the stockholders' meeting was futile, because the action of the body of the stockholders is never a substitute for the action of the board of directors where the power of management has been vested in that board; that this rule applies with peculiar force to this case, because, by the charter of the Pacific Company, 5 of its 20 directors are appointed by the government, and are not stockholders; and that, in any event, the action of the meeting of the executive committee and of the stockholders' meeting on this subject was void, because the calls for those meetings gave no notice that the subject-matter of this contract would be there considered.

Section 13 of the act of July 2, 1864, (13 St. at Large, p. 361,) provides that 5 of the 20 members of the board of directors of the Pacific Company shall be appointed by the government, and that at least one of the government directors shall be placed on each of the standing committees. The fact that the congress, when it had the power to control this corporation by the appointment of a majority of this board, refused to exercise that power, and limited the number of government directors to so powerless a minority, strongly indicates that in the management of the affairs of the corporation their power was not intended to be much greater than that of a corps of observation. Much has been said in argument of the rights and privileges of these government directors, much claimed from the fact that the government director who was a member of the executive committee was absent when that committee approved of this contract; but there is no provision of the Pacific Railway Acts which gives any greater power to the act or vote of a government director than to that of any other director, or that declares that the action of the corporation, its board of directors or executive committee, shall be governed by any other than the general rules of law applicable to such cases because of the presence or absence of such director. Hence this unique feature of this charter is not material to the determination of the questions now to be considered, and it will not be further noticed.

The administration of the corporate powers of this company was vested in the body of the stockholders, unless it had been delegated to some other body. *Dartmouth College Case*, 4 Wheat. 518, 677; *Attorney General* v. *Davy*, 2 Atk. 212; Angell & A. Corp. §§ 277, 327; Grant. Corp. p. 68.

By section 1 of the act of July 1, 1862, (12 St. at Large, p. 491,) provision was made for the incorporation of the Union Pacific Railroad Company, the receipt of subscriptions to the capital stock, and a meeting of the subscribers for the purpose of electing 13 directors, and then the section provides that "thereafter the stockholders shall constitute the body politic and corporate." The only powers granted by the act to the board of directors are to appoint engineers, agents, and subordinates to do all acts and things touching the location and construction of said road and telegraph, and to require payment of subscriptions to the capital stock. Not only this, but the same section provides that "said company, at any regular meeting of the stockholders called for that purpose, shall have power to make by-laws, rules, and regulations as they shall deem needful and proper touching the disposition of the stock, property, estate, and effects of the company not inconsistent herewith, the transfer of shares, the term of office, duties, and conduct of their officers and servants, and all matters whatsoever which may appertain to the concerns of said company." Thereupon the body of the stockholders made a by-law which provided that "the board of directors shall have the whole charge and management of the property and effects of the company, and they may delegate power to the executive committee to do any and all acts which the board is authorized to do, except such acts as by law or these by-laws must be done by the board itself." The same body made another by-law, which provided that "the executive committee shall have, and may exercise by a majority of its members, all the powers and authority which from time to time may be delegated to said committee by the board of directors."

The only acts that by any law or by-law "must be done" by the board itself were the appointment of engineers, agents, and subordinates, the acts and things touching the location and construction of said road and telegraph, and the collection of the subscriptions. The charter, therefore, vested the power to consider and act upon this contract in the body of the stockholders, with authority, through the enactment of by-laws, to delegate that power. By the by-laws cited above that body did delegate this power to the board of directors, and in the same by-laws expressly authorized that board to substitute for itself the executive committee in the execution of this and every other power delegated to the board. No words more apt to grant this complete power of substitution could have been used. Under this authority, in the year 1880, and annually thereafter, the board of directors passed a resolution, which provided that, "while the board of directors is not in session, the full power thereof, under the charter and by-laws of the company, be, and is hereby, conferred upon the executive committee;" and the executive committee has constantly exercised that power since that date whenever the board was not in session. This resolution, through the power of substitution cited, effected a lawful delegation to the executive committee of the entire power of the corporation to consider and authorize the execution of this contract; and since the executive committee and the body of the stockholders at their respective meetings approved and

ratified the same and its execution, the defense that the corporation is not bound by this contract, because no formal resolution of the board of directors to the same effect was passed, cannot be maintained.

There is another reason why neither this defense nor the objection that the calls for the meetings of the committee and stockholders gave no notice that this subject would be there considered is not now open to the Pacific Company. This contract was within the general powers of the corporation; the charter originally vested the power to authorize it in the body of the stockholders; the Pacific Company, by its action and by its acquiescence, induced the complainant to believe, and to act on the belief, that its execution of this contract was duly authorized. No corporation can, by the formal execution and delivery of a contract within its corporate powers, by long acquiescence therein, and by itself entering upon the performance and taking the benefits thereof, induce the other party to the contract to expend large sums of money or incur onerous liabilities, otherwise unnecessary, in reliance upon, and in part performance of, the contract, and then repudiate it, and escape liability thereon, on the ground that in obtaining authority for its execution it did not itself comply with some formal rule or regulation, with which it might have complied, but which it chose to disregard. The perpetration of such an injustice is no more permitted to a corporation than to an individual.

In *Zabriskie* v. *Railroad Co.*, 23 How. 381, the defendant corporation indorsed its guaranty upon certain bonds of another railroad company, acting under authority of an act of the legislature of Ohio, which provided that any existing company might accept of any of its provisions, and when so accepted, and a certified copy of their acceptance filed with the secretary of state, those portions of their charters inconsistent with the provisions of the act should be repealed. The defendant corporation had never accepted this act, or filed any acceptance thereof, and the call of the stockholders' meeting, at which the corporation was authorized to make the guaranty, did not give notice that this matter would be there considered. On these grounds the plaintiff, who was a stockholder, claimed the guaranty was void, and sought to enjoin the corporation from paying interest thereon. Some of the holders of the bonds were joined as defendants. Mr. Justice CAMPBELL, speaking of the first objection and the corporation's failure to accept the provisions of the act of the legislature, said:

"The corporation have executed the power and claimed the privilege conferred by them, and they cannot exonerate themselves from the responsibility by asserting that they have not filed the evidence required by the statute to evince their decision." Page 397.

After reviewing the facts regarding the call for the stockholders' meeting, he said:

"But we are to regard the conduct of the corporation from an external position. The community at large must form their judgment of it from the acts and resolutions adopted by the authorities of the corporation and the

meeting of the stockholders, and by their acquiescence in them. These negotiable securities have been placed on sale in the community, accompanied by these resolutions and votes inviting public confidence. They have circulated without an effort on the part of the corporation or the corporators to restrain them or to disabuse those who were influenced by these apparently official acts. Men have invested their money on the assurance they have afforded. A corporation, quite as much as an individual, is held to a careful adherence to the truth in their dealings with mankind, and cannot, by their representations or silence, involve others in onerous engagements, and then defeat the calculations and claims their own conduct had superinduced." Pages 400, 401.

The Pacific Company delivered this contract, signed by its president and secretary, and sealed with its corporate seal, to the Rock Island Company. This was *prima facie* evidence that it was executed on behalf of the corporation by lawful authority. *Burrill* v. *Nahant Bank*, 2 Metc. (Mass.) 163, 166, 167; *Canandarqua Academy* v. *McKechnie*, 90 N.Y. 618, 629; *Wood* v. *Whelen*, 93 Ill. 153, 162; *Southern Cal.*, etc., *Ass'n* v. *Bustamente*, 52 Cal. 192. It delivered to that company a formal resolution, unanimously passed by the body of its stockholders at their annual meeting, at which two thirds of its stock was represented, approving the contract and ratifying its execution. This resolution was presumptive evidence that the meeting at which it was adopted was legally called, and that the action of the executive committee therein referred to and ratified was at a meeting legally called. *Chouteau Ins. Co.* v. *Holmes*, 68 Mo. 601; *Sargent* v. *Webster*, 13 Metc. (Mass.) 497, 504; *Lane* v. *Brainerd*, 30 Conn. 565, 577; *People* v. *Batchelor*, 22 N. Y. 128. On May 17, 1890, the Pacific Company requested, and shortly after obtained, and until January, 1891, continued to enjoy, the use of the line of the Rock Island Company from McPherson to Hutchinson under this contract. No note of warning, no notice that this contract was executed without authority, came from the Pacific Company for seven months. "When a contract is made by any agent of a corporation in its behalf, and for a purpose authorized by its charter, and the corporation receives the benefit of the contract, without objection, it may be presumed to have authorized or ratified the contract of its agent." *Pittsburgh, etc., Ry. Co.* v. *Keokuk & H. Bridge Co.*, 131 U. S. 381, 9 Sup. Ct. Rep. 770; *Bank of Columbia* v. *Patterson*, 7 Cranch, 299; *Bank of United States* v. *Dandridge*, 12 Wheat. 64; *Zabriskie* v. *Railroad Co.*, 23 How. 381; *Gold Min. Co.* v. *National Bank*, 96 U. S. 640; *Pneumatic Gas Co.* v. *Berry*, 113 U. S. 322, 327, 5 Sup. Ct. Rep. 525.

On this contract, this resolution, this action and acquiescence of the Pacific Company, the Rock Island Company had a right to rely. In reliance thereon it constructed during those seven months the proposed railroad from South Omaha to Lincoln, mentioned in the contract, at an expense of over a million dollars, and, under a joint arrangement with the Pacific Company, it constructed a depot at Lincoln, on the grounds of the Republican Valley Company, to be used at the junction of this new road with the Pacific Company's line at that point. The great purpose of this expenditure was, by the use of this road and in

the performance of this contract, to obtain a continuous line from Chicago to Denver, and the repudiation of the contract would frustrate this purpose, and greatly depreciate the value of this new road and its appurtenances. Under these circumstances, to permit this company now to repudiate this contract would violate every principle of equity and fair dealing. By its presentation to the Rock Island Company of this contract, and this resolution, acts apparently official, by its acceptance of a part of the benefits of the contract, by its silence for seven months while this large expenditure of money was being made in reliance on this contract, it is estopped to declare it void, either because its board of directors failed to pass a formal resolution approving it, or because its secretary failed to state in his calls that this contract would be considered at the meetings that unanimously authorized and ratified it. The Pacific Company is bound by the contract. *St. Louis, V. & T. H. R. Co.* v. *Terre Haute & I. R. Co.*, 12 Sup. Ct. Rep. 953, 956; *Central Transp. Co.* v. *Pullman's Palace Car Co.*, 139 U. S. 60, 11 Sup. Ct. Rep. 478; *Beecher* v. *Rolling Mill Co.*, 45 Mich. 103, 109, 7 N. W. Rep. 695; *Davis* v. *Railroad Co.*, 131 Mass. 258, 260; *Thomas* v. *Railway Co.*, 104 Ill. 462, 467.

The third objection urged is that this contract is *ultra vires* of the Rock Island Company. The contention is that the Rock Island Company had not complied with the statutes of the state of Nebraska, with which it must comply in order to derive power to operate a railway in that state as provided by the contract; that on this account the contract could not be enforced against the Rock Island Company; and therefore that company cannot enforce it against the Pacific Company. After the testimony had been closed, and at the final argument, the defendants moved the court to permit the introduction of the evidence on which alone this contention is based. The complainant objected on the grounds that the testimony had been closed, that no good reason was shown for its introduction at that time, and that it was incompetent, irrelevant, and immaterial. The court overruled the motion, sustained complainant's objections, and defendants excepted. It was discretionary with the court below to grant or refuse this motion. To refuse it was certainly no abuse of this discretion, and we do not feel authorized to consider this rejected evidence, or the argument based upon it. Without the rejected evidence, the record proved this contract to be within the powers of the Rock Island Company. *Railway Co.* v. *McCarthy*, 96 U. S. 267.

The fourth objection is that this contract is void because the charter of the Rock Island Company expires by its terms in 1930, and that company could not contract beyond the stated period of its own existence. This objection cannot be sustained. A lease for a time certain, if the lessee shall live so long, has always been held valid, and a lease for 999 years, if the lessee shall be in existence so long, is likewise valid. Wood Landl. & Ten. § 61, p. 144; *Gere* v. *Railway Co.*, 19 Abb. N. C. 193, 203. Again, this contract provides that it shall attach to that portion of each railway leased, and shall bind the grantors, and the assigns and suc-

cessors of each party to it, during the existence of their several corporate existences, and that each party shall take such steps as may be necessary to continue the contract in force.    The charter of the Rock Island Company provides that its existence "may be renewed from time to time as may be provided by the laws of the states of Illinois and Iowa."    The contingency that this corporation will cease to exist, and leave neither assigns nor successors, is far too remote to have any influence upon the validity of this contract.

Nor can the fifth objection urged to this contract be sustained.    It is that the contract is void as to the Republican Valley Company, because it does not provide for the payment of any consideration to that company for the use of its railroad.    The contract, however, does provide that the consideration for the use of this railroad shall be paid to the Pacific Company.    Now a contract by an individual to perform certain services for B. for a consideration to be paid to C. is a valid contract.    The only reason why such a contract by the officers of a corporation on its behalf may not be valid is because they are the trustees of the stockholders of the corporation, and they may not make a contract on its behalf depriving it of any right or property, unless the benefit therefrom inures to their *cestuis que trustent.*    In this case the Pacific Company had furnished the money to construct the railroad of the Republican Valley Company; it owned substantially all its bonds; it owned substantially all its stock,—all of it that had ever been represented at any stockholders' meeting; and from the construction of its railroad to the date of this contract the Pacific Company controlled and operated, as the sole owner of its stock and bonds, the railroad of the Republican Valley Company.    Under these circumstances, the Republican Valley Company and its officers held all the property of that corporation in trust for the Pacific Company, and that they reserved the consideration of this contract to their *cestui que trust,* to whom it belonged, and to whom the law required it to be paid, instead of to that corporation, is no objection to its validity.    When the reason ceases, the rule also ceases.    That at some future time the ownership of this stock, and the right to receive this rental, may become separated, is not material here.    It is sufficient that now the contract provides that the consideration shall be paid to the party to whom it belongs, and the presumption is that any future seller or purchaser of the stock or the right to this rental will make his price with due regard to the terms of this contract.

The next objection made to this decree is that this contract is not one of which specific performance can be enforced in equity; that the acts to be performed under it are so numerous and complicated, and their performance is to extend through so long a term of years, that it would be impracticable for any court to supervise and enforce such performance. The question here presented is no longer open for consideration in the federal courts.    It is settled adversely to the appellants by the decision in *Joy* v. *City of St. Louis,* 138 U. S. 1, 11 Sup. Ct. Rep. 243, and we affirm, and adopt upon this question, the following quotation from the opinion of Mr. Justice BREWER, in the case at bar:

"*Third*. Is this contract one of which a court of equity may compel specific performance? Fortunately, a recent decision of the supreme court in the case of *Joy* v. *City of St. Louis*, 138 U. S. 1, 11 Sup. Ct. Rep. 243, relieves from any embarrassment. That case was originally heard before me while I was circuit judge; and after a careful examination, and though in the face of seemingly adverse precedents, I decreed specific performance of a contract for the joint use of track. That decree was affirmed by the unanimous opinion of the supreme court. All the objections which are here made were presented there and overruled, and the necessity of the interposition of a court of equity in cases of this kind clearly shown by Mr. Justice BLATCHFORD in the opinion of the court. The spirit of that decision is expressed in this quotation: ' Railroads are common carriers, and owe duties to the public. The rights of the public in respect to these great methods of communication should be fostered by the courts; and it is one of the most useful functions of a court of equity that its methods of procedure are capable of being made such as to accommodate themselves to the development of the interests of the public, in the progress of trade and traffic, by new methods of intercourse and transportation.' " 47 Fed. Rep. 25.

The general rule invoked by counsel for the Pacific Company that an agreement to submit a controversy to arbitration cannot be specifically enforced in equity has no application to this case, because the stipulations in this contract to submit to referees are not the essence of the agreement, but relate to minor details of its performance, and are merely auxiliary to the principal contract, and because the contract has been partly performed, the Pacific Company has accepted some of its benefits, the Rock Island Company has made large expenditures in reliance upon it, and a failure to enforce it would result in gross injustice. *Tscheider* v. *Biddle*, 4 Dill. 55, 60, 61; *Gregory* v. *Mighell*, 18 Ves. 333; *Black* v. *Rogers*, 75 Mo. 441, 449; *Coles* v. *Peck*, 96 Ind. 333, 341; *Jackson* v. *Jackson*, 1 Smale & G. 184.

Finally, we are urged to reverse this decree because it is said that the contract was improvidently made, and is inequitable, and a court of equity ought not to enforce it. There is no doubt that the powers of a court of equity ought not to be exercised to enforce a contract that is hard and unconscionable, where such action would work great injustice to the defendant, although he may have been guilty of a breach of the contract; but in this case we are satisfied that this contract was just and fair, and that it was deliberately made on behalf of the Pacific Company by men of exceptional intelligence and familiarity with its subject-matter. The two great corporations that brought these suits in a great measure controlled the carrying trade that was done over the Omaha bridge; they were raising the money to construct a rival bridge and railroad at Omaha. The construction of such a bridge meant a diversion from the bridge of the Pacific Company of the traffic the complainants controlled. To avert the construction of this bridge and the diversion of this traffic was the great purpose of this contract on the part of the Pacific Company. At its request the complainant companies desisted from their efforts to construct their bridge, and made this contract. All the carrying trade of all these railroads at Omaha had been passing over the bridge of the Pacific Company for years. The officers of that company

had the best means of information and undoubtedly the most accurate knowledge regarding the subject-matter of this contract. They were men of high intelligence, whose long experience in railroad management had ripened their judgment and peculiarly fitted them to deal wisely with the subject here presented. They fixed their own price for the use of their bridge and tracks at Omaha, and that price was inserted in the contracts. In their opinion, the contracts were fair and just; the best interests of the Pacific Company demanded their execution; they advised and caused their execution by that company; and, in our opinion, the evidence in this case amply vindicates their judgment. The result is that the Pacific Company has accomplished its great object in making this contract; it has prevented the construction of the rival bridge; it has averted a diversion of the traffic from its own bridge and tracks.

The main object of the Rock Island Company in making the contract was to get the use of the Pacific Company's bridge from Council Bluffs to Omaha, and its tracks from Council Bluffs to South Omaha, and from Lincoln to Beatrice, to fill the gap in its continuous line from Chicago to Denver. To accomplish its purpose, the Pacific Company made this solemn contract to permit this use; it delivered that contract to the Rock Island Company with a formal resolution of the body of its stockholders, showing its apparently official character; it demanded, obtained, and enjoyed a part of the benefits of the contract for seven months; it gave no warning or notice that it would not perform its contract on account of its invalidity or for any other reason until the Rock Island Company had built its proposed railroad from South Omaha to Lincoln, to be used as a part of its continuous line, at an expense of more than a million dollars, and then, for the first time, it utterly refused to perform its contract, and left the Rock Island Company without a bridge or the use of one, without its continuous line, with nothing but this fragment of a road from South Omaha to Lincoln, and even that the Pacific Company prohibited it from connecting with its tracks. For such a breach of such a contract no jury, no court, could justly measure the damages; no action at law could give adequate remedy. There was but one effective remedy, and that was the enforcement of this contract. That this remedy should be here applied, the wrongs of the Rock Island Company, the interest of the public in rapid and speedy transportation over continuous lines at the least expense, and its higher interest in that wise administration of complete justice, which is the great safeguard of civilized society, alike demanded. To have refused it, and left these wrongs unredressed, would have been neither just nor equitable.

The contract was within the corporate powers of each of the parties to it; each of them by its own acts became legally bound to perform it; the powers of the court below were ample to enforce it; those powers were wisely exercised in granting its decree; and that decree is hereby affirmed, with costs.

The questions involved in the case of the *Union Pacific Railway Company, Appellant, vs. Chicago, Milwaukee & St. Paul Railway Company, Appellee,* are decided by the foregoing opinion, and the decree in that case is also affirmed, with costs.